# WEST COAST HOTEL CO. *v.* PARRISH ET AL.

No. 293.   Argued December 16, 17, 1936.—Decided March 29, 1937.

*Mr. E. L. Skeel,* with whom *Mr. John W. Roberts* was on the brief, for appellant.

*Messrs. C. B. Conner* and *Sam M. Driver* filed a brief on behalf of appellees.

*Mr. W. A. Toner,* Assistant Attorney General of Washington, with whom *Mr. G. W. Hamilton,* Attorney General, and *Mr. George G. Hannan,* Assistant Attorney

General, were on the brief, by special leave of Court, on behalf of the State of Washington, as *amicus curiae*.

Mr. Chief Justice Hughes delivered the opinion of the Court.

This case presents the question of the constitutional validity of the minimum wage law of the State of Washington.

The Act, entitled "Minimum Wages for Women," authorizes the fixing of minimum wages for women and minors. Laws of 1913 (Washington) chap. 174; Remington's Rev. Stat. (1932), §§ 7623 *et seq.* It provides:

"Section 1. The welfare of the State of Washington demands that women and minors be protected from conditions of labor which have a pernicious effect on their health and morals. The State of Washington, therefore, exercising herein its police and sovereign power declares that inadequate wages and unsanitary conditions of labor exert such pernicious effect.

"Sec. 2. It shall be unlawful to employ women or minors in any industry or occupation within the State of Washington under conditions of labor detrimental to their health or morals; and it shall be unlawful to employ

women workers in any industry within the State of Washington at wages which are not adequate for their maintenance.

"SEC. 3. There is hereby created a commission to be known as the 'Industrial Welfare Commission' for the State of Washington, to establish such standards of wages and conditions of labor for women and minors employed within the State of Washington, as shall be held hereunder to be reasonable and not detrimental to health and morals, and which shall be sufficient for the decent maintenance of women."

Further provisions required the Commission to ascertain the wages and conditions of labor of women and minors within the State. Public hearings were to be held. If after investigation the Commission found that in any occupation, trade or industry the wages paid to women were "inadequate to supply them necessary cost of living and to maintain the workers in health," the Commission was empowered to call a conference of representatives of employers and employees together with disinterested persons representing the public. The conference was to recommend to the Commission, on its request, an estimate of a minimum wage adequate for the purpose above stated, and on the approval of such a recommendation it became the duty of the Commission to issue an obligatory order fixing minimum wages. Any such order might be reopened and the question reconsidered with the aid of the former conference or a new one. Special licenses were authorized for the employment of women who were "physically defective or crippled by age or otherwise," and also for apprentices, at less than the prescribed minimum wage.

By a later Act the Industrial Welfare Commission was abolished and its duties were assigned to the Industrial Welfare Committee consisting of the Director of Labor and Industries, the Supervisor of Industrial Insurance,

the Supervisor of Industrial Relations, the Industrial Statistician and the Supervisor of Women in Industry. Laws of 1921 (Washington) c. 7; Remington's Rev. Stat. (1932), §§ 10840, 10893.

The appellant conducts a hotel. The appellee Elsie Parrish was employed as a chambermaid and (with her husband) brought this suit to recover the difference between the wages paid her and the minimum wage fixed pursuant to the state law. The minimum wage was $14.50 per week of 48 hours. The appellant challenged the act as repugnant to the due process clause of the Fourteenth Amendment of the Constitution of the United States. The Supreme Court of the State, reversing the trial court, sustained the statute and directed judgment for the plaintiffs. *Parrish* v. *West Coast Hotel Co.,* 185 Wash. 581; 55 P. (2d) 1083. The case is here on appeal.

The appellant relies upon the decision of this Court in *Adkins* v. *Children's Hospital,* 261 U. S. 525, which held invalid the District of Columbia Minimum Wage Act, which was attacked under the due process clause of the Fifth Amendment. On the argument at bar, counsel for the appellees attempted to distinguish the *Adkins* case upon the ground that the appellee was employed in a hotel and that the business of an innkeeper was affected with a public interest. That effort at distinction is obviously futile, as it appears that in one of the cases ruled by the *Adkins* opinion the employee was a woman employed as an elevator operator in a hotel. *Adkins* v. *Lyons,* 261 U. S. 525, at p. 542.

The recent case of *Morehead* v. *New York ex rel. Tipaldo,* 298 U. S. 587, came here on certiorari to the New York court, which had held the New York minimum wage act for women to be invalid. A minority of this Court thought that the New York statute was distinguishable in a material feature from that involved in the *Adkins* case, and that for that and other reasons the New

York statute should be sustained. But the Court of Appeals of New York had said that it found no material difference between the two statutes, and this Court held that the "meaning of the statute" as fixed by the decision of the state court "must be accepted here as if the meaning had been specifically expressed in the enactment." *Id.*, p. 609. That view led to the affirmance by this Court of the judgment in the *Morehead* case, as the Court considered that the only question before it was whether the *Adkins* case was distinguishable and that reconsideration of that decision had not been sought. Upon that point the Court said: "The petition for the writ sought review upon the ground that this case [Morehead] is distinguishable from that one [Adkins]. No application has been made for reconsideration of the constitutional question there decided. The validity of the principles upon which that decision rests is not challenged. This court confines itself to the ground upon which the writ was asked or granted . . . Here the review granted was no broader than that sought by the petitioner . . . He is not entitled and does not ask to be heard upon the question whether the *Adkins* case should be overruled. He maintains that it may be distinguished on the ground that the statutes are vitally dissimilar." *Id.*, pp. 604, 605.

We think that the question which was not deemed to be open in the *Morehead* case is open and is necessarily presented here. The Supreme Court of Washington has upheld the minimum wage statute of that State. It has decided that the statute is a reasonable exercise of the police power of the State. In reaching that conclusion the state court has invoked principles long established by this Court in the application of the Fourteenth Amendment. The state court has refused to regard the decision in the *Adkins* case as determinative and has pointed to our decisions both before and since that case as justifying its position. We are of the opinion that this ruling of

the state court demands on our part a reëxamination of the *Adkins* case. The importance of the question, in which many States having similar laws are concerned, the close division by which the decision in the *Adkins* case was reached, and the economic conditions which have supervened, and in the light of which the reasonableness of the exercise of the protective power of the State must be considered, make it not only appropriate, but we think imperative, that in deciding the present case the subject should receive fresh consideration.

The history of the litigation of this question may be briefly stated. The minimum wage statute of Washington was enacted over twenty-three years ago. Prior to the decision in the instant case it had twice been held valid by the Supreme Court of the State. *Larsen* v. *Rice,* 100 Wash. 642; 171 Pac. 1037; *Spokane Hotel Co.* v. *Younger,* 113 Wash. 359; 194 Pac. 595. The Washington statute is essentially the same as that enacted in Oregon in the same year. Laws of 1913 (Oregon) chap. 62. The validity of the latter act was sustained by the Supreme Court of Oregon in *Stettler* v. *O'Hara,* 69 Ore. 519; 139 Pac. 743, and *Simpson* v. *O'Hara,* 70 Ore. 261; 141 Pac. 158. These cases, after reargument, were affirmed here by an equally divided court, in 1917. 243 U. S. 629. The law of Oregon thus continued in effect. The District of Columbia Minimum Wage Law (40 Stat. 960) was enacted in 1918. The statute was sustained by the Supreme Court of the District in the *Adkins* case. Upon appeal the Court of Appeals of the District first affirmed that ruling but on rehearing reversed it and the case came before this Court in 1923. The judgment of the Court of Appeals holding the Act invalid was affirmed, but with Chief Justice Taft, Mr. Justice Holmes and Mr. Justice Sanford dissenting, and Mr. Justice Brandeis taking no part. The dissenting opinions took the ground that the decision was at variance with the

principles which this Court had frequently announced and applied. In 1925 and 1927, the similar minimum wage statutes of Arizona and Arkansas were held invalid upon the authority of the *Adkins* case. The Justices who had dissented in that case bowed to the ruling and Mr. Justice Brandeis dissented. *Murphy* v. *Sardell,* 269 U. S. 530; *Donham* v. *West-Nelson Co.,* 273 U. S. 657. The question did not come before us again until the last term in the *Morehead* case, as already noted. In that case, briefs supporting the New York statute were submitted by the States of Ohio, Connecticut, Illinois, Massachusetts, New Hampshire, New Jersey and Rhode Island. 298 U. S., p. 604, *note.* Throughout this entire period the Washington statute now under consideration has been in force.

The principle which must control our decision is not in doubt. The constitutional provision invoked is the due process clause of the Fourteenth Amendment governing the States, as the due process clause invoked in the *Adkins* case governed Congress. In each case the violation alleged by those attacking minimum wage regulation for women is deprivation of freedom of contract. What is this freedom? The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation the Constitution does not recognize an absolute and uncontrollable liberty. Liberty in each of its phases has its history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process.

This essential limitation of liberty in general governs freedom of contract in particular. More than twenty-five years ago we set forth the applicable principle in these words, after referring to the cases where the liberty guaranteed by the Fourteenth Amendment had been broadly described: [1]

"But it was recognized in the cases cited, as in many others, that freedom of contract is a qualified and not an absolute right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community." *Chicago, B. & Q. R. Co.* v. *McGuire,* 219 U. S. 549, 567.

This power under the Constitution to restrict freedom of contract has had many illustrations.[2] That it may be exercised in the public interest with respect to contracts

[1] *Allgeyer* v. *Louisiana,* 165 U. S. 578; *Lochner* v. *New York,* 198 U. S. 45; *Adair* v. *United States,* 208 U. S. 161.

[2] *Munn* v. *Illinois,* 94 U. S. 113; *Railroad Commission Cases,* 116 U. S. 307; *Willcox* v. *Consolidated Gas Co.,* 212 U. S. 19; *Atkin* v. *Kansas,* 191 U. S. 207; *Mugler* v. *Kansas,* 123 U. S. 623; *Crowley* v. *Christensen,* 137 U. S. 86; *Gundling* v. *Chicago,* 177 U. S. 183; *Booth* v. *Illinois,* 184 U. S. 425; *Schmidinger* v. *Chicago,* 226 U. S. 578; *Armour & Co.* v. *North Dakota,* 240 U. S. 510; *National Fire Insurance Co.* v. *Wanberg,* 260 U. S. 71; *Radice* v. *New York,* 264 U. S. 292; *Yeiser* v. *Dysart,* 267 U. S. 540; *Liberty Warehouse Co.* v. *Burley Tobacco Growers' Assn.,* 276 U. S. 71, 97; *Highland* v. *Russell Car Co.,* 279 U. S. 253, 261; *O'Gorman & Young* v. *Hartford Insurance Co.,* 282 U. S. 249, 251; *Hardware Dealers Insurance Co.* v. *Glidden Co.,* 284 U. S. 151, 157; *Packer Corp.* v. *Utah,* 285 U. S. 95, 111; *Stephenson* v. *Binford,* 287 U. S. 251, 274; *Hartford Accident Co.* v. *Nelson Mfg. Co.,* 291 U. S. 352, 360; *Petersen Baking Co.* v. *Bryan,* 290 U. S. 570; *Nebbia* v. *New York,* 291 U. S. 502, 527–529.

between employer and employee is undeniable. Thus statutes have been sustained limiting employment in underground mines and smelters to eight hours a day (*Holden* v. *Hardy,* 169 U. S. 366); in requiring redemption in cash of store orders or other evidences of indebtedness issued in the payment of wages (*Knoxville Iron Co.* v. *Harbison,* 183 U. S. 13); in forbidding the payment of seamen's wages in advance (*Patterson* v. *Bark Eudora,* 190 U. S. 169); in making it unlawful to contract to pay miners employed at quantity rates upon the basis of screened coal instead of the weight of the coal as originally produced in the mine (*McLean* v. *Arkansas,* 211 U. S. 539); in prohibiting contracts limiting liability for injuries to employees (*Chicago, B. & Q. R. Co.* v. *McGuire, supra*); in limiting hours of work of employees in manufacturing establishments (*Bunting* v. *Oregon,* 243 U. S. 426); and in maintaining workmen's compensation laws (*New York Central R. Co.* v. *White,* 243 U. S. 188; *Mountain Timber Co.* v. *Washington,* 243 U. S. 219). In dealing with the relation of employer and employed, the legislature has necessarily a wide field of discretion in order that there may be suitable protection of health and safety, and that peace and good order may be promoted through regulations designed to insure wholesome conditions of work and freedom from oppression. *Chicago, B. & Q. R. Co.* v. *McGuire, supra,* p. 570.

The point that has been strongly stressed that adult employees should be deemed competent to make their own contracts was decisively met nearly forty years ago in *Holden* v. *Hardy, supra,* where we pointed out the inequality in the footing of the parties. We said (*Id.,* 397):

"The legislature has also recognized the fact, which the experience of legislators in many States has corroborated, that the proprietors of these establishments and their operatives do not stand upon an equality, and that

their interests are, to a certain extent, conflicting. The former naturally desire to obtain as much labor as possible from their employes, while the latter are often induced by the fear of discharge to conform to regulations which their judgment, fairly exercised, would pronounce to be detrimental to their health or strength. In other words, the proprietors lay down the rules and the laborers are practically constrained to obey them. In such cases self-interest is often an unsafe guide, and the legislature may properly interpose its authority."

And we added that the fact "that both parties are of full age and competent to contract does not necessarily deprive the State of the power to interfere where the parties do not stand upon an equality, or where the public health demands that one party to the contract shall be protected against himself." "The State still retains an interest in his welfare, however reckless he may be. The whole is no greater than the sum of all the parts, and when the individual health, safety and welfare are sacrificed or neglected, the State must suffer."

It is manifest that this established principle is peculiarly applicable in relation to the employment of women in whose protection the State has a special interest. That phase of the subject received elaborate consideration in *Muller* v. *Oregon* (1908), 208 U. S. 412, where the constitutional authority of the State to limit the working hours of women was sustained. We emphasized the consideration that "woman's physical structure and the performance of maternal functions place her at a disadvantage in the struggle for subsistence" and that her physical well being "becomes an object of public interest and care in order to preserve the strength and vigor of the race." We emphasized the need of protecting women against oppression despite her possession of contractual rights. We said that "though limitations upon personal and contractual rights may be removed by legislation, there is that in her

disposition and habits of life which will operate against a full assertion of those rights. She will still be where some legislation to protect her seems necessary to secure a real equality of right." Hence she was "properly placed in a class by herself, and legislation designed for her protection may be sustained even when like legislation is not necessary for men and could not be sustained." We concluded that the limitations which the statute there in question "placed upon her contractual powers, upon her right to agree with her employer as to the time she shall labor" were "not imposed solely for her benefit, but also largely for the benefit of all." Again, in *Quong Wing* v. *Kirkendall,* 223 U. S. 59, 63, in referring to a differentiation with respect to the employment of women, we said that the Fourteenth Amendment did not interfere with state power by creating a "fictitious equality." We referred to recognized classifications on the basis of sex with regard to hours of work and in other matters, and we observed that the particular points at which that difference shall be enforced by legislation were largely in the power of the State. In later rulings this Court sustained the regulation of hours of work of women employees in *Riley* v. *Massachusetts,* 232 U. S. 671 (factories), *Miller* v. *Wilson,* 236 U. S. 373 (hotels), and *Bosley* v. *McLaughlin,* 236 U. S. 385 (hospitals).

This array of precedents and the principles they applied were thought by the dissenting Justices in the *Adkins* case to demand that the minimum wage statute be sustained. The validity of the distinction made by the Court between a minimum wage and a maximum of hours in limiting liberty of contract was especially challenged. 261 U. S., p. 564. That challenge persists and is without any satisfactory answer. As Chief Justice Taft observed: "In absolute freedom of contract the one term is as important as the other, for both enter equally into the consideration given and received, a restriction as to

the one is not greater in essence than the other and is of the same kind. One is the multiplier and the other the multiplicand." And Mr. Justice Holmes, while recognizing that "the distinctions of the law are distinctions of degree," could "perceive no difference in the kind or degree of interference with liberty, the only matter with which we have any concern, between the one case and the other. The bargain is equally affected whichever half you regulate." *Id.*, p. 569.

One of the points which was pressed by the Court in supporting its ruling in the *Adkins* case was that the standard set up by the District of Columbia Act did not take appropriate account of the value of the services rendered. In the *Morehead* case, the minority thought that the New York statute had met that point in its definition of a "fair wage" and that it accordingly presented a distinguishable feature which the Court could recognize within the limits which the *Morehead* petition for certiorari was deemed to present. The Court, however, did not take that view and the New York Act was held to be essentially the same as that for the District of Columbia. The statute now before us is like the latter, but we are unable to conclude that in its minimum wage requirement the State has passed beyond the boundary of its broad protective power.

The minimum wage to be paid under the Washington statute is fixed after full consideration by representatives of employers, employees and the public. It may be assumed that the minimum wage is fixed in consideration of the services that are performed in the particular occupations under normal conditions. Provision is made for special licenses at less wages in the case of women who are incapable of full service. The statement of Mr. Justice Holmes in the *Adkins* case is pertinent: "This statute does not compel anybody to pay anything. It simply forbids employment at rates below those fixed as

the minimum requirement of health and right living. It is safe to assume that women will not be employed at even the lowest wages allowed unless they earn them, or unless the employer's business can sustain the burden. In short the law in its character and operation is like hundreds of so-called police laws that have been upheld." 261 U. S., p. 570. And Chief Justice Taft forcibly pointed out the consideration which is basic in a statute of this character: "Legislatures which adopt a requirement of maximum hours or minimum wages may be presumed to believe that when sweating employers are prevented from paying unduly low wages by positive law they will continue their business, abating that part of their profits, which were wrung from the necessities of their employees, and will concede the better terms required by the law; and that while in individual cases hardship may result, the restriction will enure to the benefit of the general class of employees in whose interest the law is passed and so to that of the community at large." *Id.*, p. 563.

We think that the views thus expressed are sound and that the decision in the *Adkins* case was a departure from the true application of the principles governing the regulation by the State of the relation of employer and employed. Those principles have been reënforced by our subsequent decisions. Thus in *Radice* v. *New York,* 264 U. S. 292, we sustained the New York statute which restricted the employment of women in restaurants at night. In *O'Gorman & Young* v. *Hartford Fire Insurance Co.,* 282 U. S. 251, which upheld an act regulating the commissions of insurance agents, we pointed to the presumption of the constitutionality of a statute dealing with a subject within the scope of the police power and to the absence of any factual foundation of record for deciding that the limits of power had been transcended. In *Nebbia* v. *New York,* 291 U. S. 502, dealing

with the New York statute providing for minimum prices for milk, the general subject of the regulation of the use of private property and of the making of private contracts received an exhaustive examination and we again declared that if such laws "have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied"; that "with the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal"; that "times without number we have said that the legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power." *Id.*, pp. 537, 538.

With full recognition of the earnestness and vigor which characterize the prevailing opinion in the *Adkins* case, we find it impossible to reconcile that ruling with these well-considered declarations. What can be closer to the public interest than the health of women and their protection from unscrupulous and overreaching employers? And if the protection of women is a legitimate end of the exercise of state power, how can it be said that the requirement of the payment of a minimum wage fairly fixed in order to meet the very necessities of existence is not an admissible means to that end? The legislature of the State was clearly entitled to consider the situation of women in employment, the fact that they are in the class receiving the least pay, that their bargaining power is relatively weak, and that they are the ready victims of those who would take advantage of their necessitous circumstances. The legislature was entitled to adopt measures to reduce the evils of the "sweating sys-

tem," the exploiting of workers at wages so low as to be insufficient to meet the bare cost of living, thus making their very helplessness the occasion of a most injurious competition. The legislature had the right to consider that its minimum wage requirements would be an important aid in carrying out its policy of protection. The adoption of similar requirements by many States evidences a deepseated conviction both as to the presence of the evil and as to the means adapted to check it. Legislative response to that conviction cannot be regarded as arbitrary or capricious, and that is all we have to decide. Even if the wisdom of the policy be regarded as debatable and its effects uncertain, still the legislature is entitled to its judgment.

There is an additional and compelling consideration which recent economic experience has brought into a strong light. The exploitation of a class of workers who are in an unequal position with respect to bargaining power and are thus relatively defenceless against the denial of a living wage is not only detrimental to their health and well being but casts a direct burden for their support upon the community. What these workers lose in wages the taxpayers are called upon to pay. The bare cost of living must be met. We may take judicial notice of the unparalleled demands for relief which arose during the recent period of depression and still continue to an alarming extent despite the degree of economic recovery which has been achieved. It is unnecessary to cite official statistics to establish what is of common knowledge through the length and breadth of the land. While in the instant case no factual brief has been presented, there is no reason to doubt that the State of Washington has encountered the same social problem that is present elsewhere. The community is not bound to provide what is in effect a subsidy for unconscionable employers. The

community may direct its law-making power to correct the abuse which springs from their selfish disregard of the public interest. The argument that the legislation in question constitutes an arbitrary discrimination, because it does not extend to men, is unavailing. This Court has frequently held that the legislative authority, acting within its proper field, is not bound to extend its regulation to all cases which it might possibly reach. The legislature "is free to recognize degrees of harm and it may confine its restrictions to those classes of cases where the need is deemed to be clearest." If "the law presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied." There is no "doctrinaire requirement" that the legislation should be couched in all embracing terms. *Carroll* v. *Greenwich Insurance Co.,* 199 U. S. 401, 411; *Patsone* v. *Pennsylvania,* 232 U. S. 138, 144; *Keokee Coke Co.* v. *Taylor,* 234 U. S. 224, 227; *Sproles* v. *Binford,* 286 U. S. 374, 396; *Semler* v. *Oregon Board,* 294 U. S. 608, 610, 611. This familiar principle has repeatedly been applied to legislation which singles out women, and particular classes of women, in the exercise of the State's protective power. *Miller* v. *Wilson, supra,* p. 384; *Bosley* v. *McLaughlin, supra,* pp. 394, 395; *Radice* v. *New York, supra,* pp. 295–298. Their relative need in the presence of the evil, no less than the existence of the evil itself, is a matter for the legislative judgment.

Our conclusion is that the case of *Adkins* v. *Children's Hospital, supra,* should be, and it is, overruled. The judgment of the Supreme Court of the State of Washington is

*Affirmed.*

MR. JUSTICE SUTHERLAND, dissenting:

MR. JUSTICE VAN DEVANTER, MR. JUSTICE McREYNOLDS, MR. JUSTICE BUTLER and I think the judgment of the court below should be reversed.

The principles and authorities relied upon to sustain the judgment, were considered in *Adkins* v. *Children's Hospital*, 261 U. S. 525, and *Morehead* v. *New York ex rel. Tipaldo*, 298 U. S. 587; and their lack of application to cases like the one in hand was pointed out. A sufficient answer to all that is now said will be found in the opinions of the court in those cases. Nevertheless, in the circumstances, it seems well to restate our reasons and conclusions.

Under our form of government, where the written Constitution, by its own terms, is the supreme law, some agency, of necessity, must have the power to say the final word as to the validity of a statute assailed as unconstitutional. The Constitution makes it clear that the power has been intrusted to this court when the question arises in a controversy within its jurisdiction; and so long as the power remains there, its exercise cannot be avoided without betrayal of the trust.

It has been pointed out many times, as in the *Adkins* case, that this judicial duty is one of gravity and delicacy; and that rational doubts must be resolved in favor of the constitutionality of the statute. But whose doubts, and by whom resolved? Undoubtedly it is the duty of a member of the court, in the process of reaching a right conclusion, to give due weight to the opposing views of his associates; but in the end, the question which he must answer is not whether such views seem sound to those who entertain them, but whether they convince him that the statute is constitutional or engender in his mind a rational doubt upon that issue. The oath which he takes as a judge is not a composite oath, but an individual one. And in passing upon the validity of a statute, he discharges a duty imposed upon *him*, which cannot be consummated justly by an automatic acceptance of the views of others which have neither convinced, nor created a reasonable doubt in, his mind. If upon a question so

important he thus surrender his deliberate judgment, he stands forsworn. He cannot subordinate his convictions to that extent and keep faith with his oath or retain his judicial and moral independence.

The suggestion that the only check upon the exercise of the judicial power, when properly invoked, to declare a constitutional right superior to an unconstitutional statute is the judge's own faculty of self-restraint, is both ill considered and mischievous. Self-restraint belongs in the domain of will and not of judgment. The check upon the judge is that imposed by his oath of office, by the Constitution and by his own conscientious and informed convictions; and since he has the duty to make up his own mind and adjudge accordingly, it is hard to see how there could be any other restraint. This court acts as a unit. It cannot act in any other way; and the majority (whether a bare majority or a majority of all but one of its members), therefore, establishes the controlling rule as the decision of the court, binding, so long as it remains unchanged, equally upon those who disagree and upon those who subscribe to it. Otherwise, orderly administration of justice would cease. But it is the right of those in the minority to disagree, and sometimes, in matters of grave importance, their imperative duty to voice their disagreement at such length as the occasion demands—always, of course, in terms which, however forceful, do not offend the proprieties or impugn the good faith of those who think otherwise.

It is urged that the question involved should now receive fresh consideration, among other reasons, because of "the economic conditions which have supervened"; but the meaning of the Constitution does not change with the ebb and flow of economic events. We frequently are told in more general words that the Constitution must be construed in the light of the present. If by that it is meant that the Constitution is made up of

living words that apply to every new condition which they include, the statement is quite true. But to say, if that be intended, that the words of the Constitution mean today what they did not mean when written—that is, that they do not apply to a situation now to which they would have applied then—is to rob that instrument of the essential element which continues it in force as the people have made it until they, and not their official agents, have made it otherwise.

The words of Judge Campbell in *Twitchell* v. *Blodgett,* 13 Mich. 127, 139–140, apply with peculiar force. "But it may easily happen," he said, "that specific provisions may, in unforeseen emergencies, turn out to have been inexpedient. This does not make these provisions any less binding. Constitutions can not be changed by events alone. They remain binding as the acts of the people in their sovereign capacity, as the framers of Government, until they are amended or abrogated by the action prescribed by the authority which created them. It is not competent for any department of the Government to change a constitution, or declare it changed, simply because it appears ill adapted to a new state of things.

". . . Restrictions have, it is true, been found more likely than grants to be unsuited to unforeseen circumstances . . . But, where evils arise from the application of such regulations, their force cannot be denied or evaded; and the remedy consists in repeal or amendment, and not in false construction." The principle is reflected in many decisions of this court. See *South Carolina* v. *United States,* 199 U. S. 437, 448–449; *Lake County* v. *Rollins,* 130 U. S. 662, 670; *Knowlton* v. *Moore,* 178 U. S. 41, 95; *Rhode Island* v. *Massachusetts,* 12 Pet. 657, 723; *Craig* v. *Missouri,* 4 Pet. 410, 431–432; *Ex parte Bain,* 121 U. S. 1, 12; *Maxwell* v. *Dow,* 176 U. S. 581, 602; *Jarrolt* v. *Moberly,* 103 U. S. 580, 586.

The judicial function is that of interpretation; it does not include the power of amendment under the guise of interpretation. To miss the point of difference between the two is to miss all that the phrase "supreme law of the land" stands for and to convert what was intended as inescapable and enduring mandates into mere moral reflections.

If the Constitution, intelligently and reasonably construed in the light of these principles, stands in the way of desirable legislation, the blame must rest upon that instrument, and not upon the court for enforcing it according to its terms. The remedy in that situation—and the only true remedy—is to amend the Constitution. Judge Cooley, in the first volume of his Constitutional Limitations (8th ed.), p. 124, very clearly pointed out that much of the benefit expected from written constitutions would be lost if their provisions were to be bent to circumstances or modified by public opinion. He pointed out that the common law, unlike a constitution, was subject to modification by public sentiment and action which the courts might recognize; but that "a court or legislature which should allow a change in public sentiment to influence it in giving to a written constitution a construction not warranted by the intention of its founders, would be justly chargeable with reckless disregard of official oath and public duty; and if its course could become a precedent, these instruments would be of little avail. . . . What a court is to do, therefore, is *to declare the law as written,* leaving it to the people themselves to make such changes as new circumstances may require. The meaning of the constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it."

The *Adkins* case dealt with an act of Congress which had passed the scrutiny both of the legislative and executive branches of the government. We recognized that

thereby these departments had affirmed the validity of the statute, and properly declared that their determination must be given great weight, but we then concluded, after thorough consideration, that their view could not be sustained. We think it not inappropriate now to add a word on that subject before coming to the question immediately under review.

The people by their Constitution created three separate, distinct, independent and coequal departments of government. The governmental structure rests, and was intended to rest, not upon any one or upon any two, but upon all three of these fundamental pillars. It seems unnecessary to repeat, what so often has been said, that the powers of these departments are different and are to be exercised independently. The differences clearly and definitely appear in the Constitution. Each of the departments is an agent of its creator; and one department is not and cannot be the agent of another. Each is answerable to its creator for what it does, and not to another agent. The view, therefore, of the Executive and of Congress that an act is constitutional is persuasive in a high degree; but it is not controlling.

Coming, then, to a consideration of the Washington statute, it first is to be observed that it is in every substantial respect identical with the statute involved in the *Adkins* case. Such vices as existed in the latter are present in the former. And if the *Adkins* case was properly decided, as we who join in this opinion think it was, it necessarily follows that the Washington statute is invalid.

In support of minimum-wage legislation it has been urged, on the one hand, that great benefits will result in favor of underpaid labor, and, on the other hand, that the danger of such legislation is that the minimum will tend to become the maximum and thus bring down the

earnings of the more efficient toward the level of the less-efficient employees. But with these speculations we have nothing to do. We are concerned only with the question of constitutionality.

That the clause of the Fourteenth Amendment which forbids a state to deprive any person of life, liberty or property without due process of law includes freedom of contract is so well settled as to be no longer open to question. Nor reasonably can it be disputed that contracts of employment of labor are included in the rule. *Adair* v. *United States,* 208 U. S. 161, 174–175; *Coppage* v. *Kansas,* 236 U. S. 1, 10, 14. In the first of these cases, Mr. Justice Harlan, speaking for the court, said, "The right of a person to sell his labor upon such terms as he deems proper is, in its essence, the same as the right of the purchaser of labor to prescribe the conditions upon which he will accept such labor from the person offering to sell. . . . In all such particulars the employer and employé have equality of right, and any legislation that disturbs that equality is an arbitrary interference with the liberty of contract which no government can legally justify in a free land."

In the *Adkins* case we referred to this language, and said that while there was no such thing as absolute freedom of contract, but that it was subject to a great variety of restraints, nevertheless, freedom of contract was the general rule and restraint the exception; and that the power to abridge that freedom could only be justified by the existence of exceptional circumstances. This statement of the rule has been many times affirmed; and we do not understand that it is questioned by the present decision.

We further pointed out four distinct classes of cases in which this court from time to time had upheld statutory interferences with the liberty of contract. They were, in brief, (1) statutes fixing rates and charges to be

exacted by businesses impressed with a public interest; (2) statutes relating to contracts for the performance of public work; (3) statutes prescribing the character, methods and time for payment of wages; and (4) statutes fixing hours of labor. It is the last class that has been most relied upon as affording support for minimum-wage legislation; and much of the opinion in the *Adkins* case (261 U. S. 547–553) is devoted to pointing out the essential distinction between fixing hours of labor and fixing wages. What is there said need not be repeated. It is enough for present purposes to say that statutes of the former class deal with an incident of the employment, having no necessary effect upon wages. The parties are left free to contract about wages, and thereby equalize such additional burdens as may be imposed upon the employer as a result of the restrictions as to hours by an adjustment in respect of the amount of wages. This court, wherever the question is adverted to, has been careful to disclaim any purpose to uphold such legislation as fixing wages, and has recognized an essential difference between the two. *E. g., Bunting* v. *Oregon,* 243 U. S. 426; *Wilson* v. *New,* 243 U. S. 332, 345–346, 353–354; and see Freund, Police Power, § 318.

We then pointed out that minimum-wage legislation such as that here involved does not deal with any business charged with a public interest, or with public work, or with a temporary emergency, or with the character, methods or periods of wage payments, or with hours of labor, or with the protection of persons under legal disability, or with the prevention of fraud. It is, simply and exclusively, a law fixing wages for adult women who are legally as capable of contracting for themselves as men, and cannot be sustained unless upon principles apart from those involved in cases already decided by the court.

Two cases were involved in the *Adkins* decision. In one of them it appeared that a woman 21 years of age,

who brought the suit, was employed as an elevator operator at a fixed salary. Her services were satisfactory, and she was anxious to retain her position, and her employer, while willing to retain her, was obliged to dispense with her services on account of the penalties prescribed by the act. The wages received by her were the best she was able to obtain for any work she was capable of performing; and the enforcement of the order deprived her, as she alleged, not only of that employment, but left her unable to secure any position at which she could make a living with as good physical and moral surroundings and as good wages as she was receiving and was willing to take. The Washington statute, of course, admits of the same situation and result, and, for aught that appears to the contrary, the situation in the present case may have been the same as that just described. Certainly, to the extent that the statute applies to such cases, it cannot be justified as a reasonable restraint upon the freedom of contract. On the contrary, it is essentially arbitrary.

Neither the statute involved in the *Adkins* case nor the Washington statute, so far as it is involved here, has the slightest relation to the capacity or earning power of the employee, to the number of hours which constitute the day's work, the character of the place where the work is to be done, or the circumstances or surroundings of the employment. The sole basis upon which the question of validity rests is the assumption that the employee is entitled to receive a sum of money sufficient to provide a living for her, keep her in health and preserve her morals. And, as we pointed out at some length in that case (pp. 555–557), the question thus presented for the determination of the board can not be solved by any general formula prescribed by a statutory bureau, since it is not a composite but an individual question to be answered for each individual, considered by herself.

What we said further in that case (pp. 557–559), is equally applicable here:

"The law takes account of the necessities of only one party to the contract. It ignores the necessities of the employer by compelling him to pay not less than a certain sum, not only whether the employee is capable of earning it, but irrespective of the ability of his business to sustain the burden, generously leaving him, of course, the privilege of abandoning his business as an alternative for going on at a loss. Within the limits of the minimum sum, he is precluded, under penalty of fine and imprisonment, from adjusting compensation to the differing merits of his employees. It compels him to pay at least the sum fixed in any event, because the employee needs it, but requires no service of equivalent value from the employee. It therefore undertakes to solve but one-half of the problem. The other half is the establishment of a corresponding standard of efficiency, and this forms no part of the policy of the legislation, although in practice the former half without the latter must lead to ultimate failure, in accordance with the inexorable law that no one can continue indefinitely to take out more than he puts in without ultimately exhausting the supply. The law is not confined to the great and powerful employers but embraces those whose bargaining power may be as weak as that of the employee. It takes no account of periods of stress and business depression, of crippling losses, which may leave the employer himself without adequate means of livelihood. To the extent that the sum fixed exceeds the fair value of the services rendered, it amounts to a compulsory exaction from the employer for the support of a partially indigent person, for whose condition there rests upon him no peculiar responsibility, and therefore, in effect, arbitrarily shifts to his shoulders a burden which, if it belongs to anybody, belongs to society as a whole.

"The feature of this statute which, perhaps more than any other, puts upon it the stamp of invalidity is that it

exacts from the employer an arbitrary payment for a purpose and upon a basis having no causal connection with his business, or the contract or the work the employee engages to do. The declared basis, as already pointed out, is not the value of the service rendered, but the extraneous circumstance that the employee needs to get a prescribed sum of money to insure her subsistence, health and morals. The ethical right of every worker, man or woman, to a living wage may be conceded. One of the declared and important purposes of trade organizations is to secure it. And with that principle and with every legitimate effort to realize it in fact, no one can quarrel; but the fallacy of the proposed method of attaining it is that it assumes that every employer is bound at all events to furnish it. The moral requirement implicit in every contract of employment, viz, that the amount to be paid and the service to be rendered shall bear to each other some relation of just equivalence, is completely ignored. The necessities of the employee are alone considered and these arise outside of the employment, are the same when there is no employment, and as great in one occupation as in another. Certainly the employer by paying a fair equivalent for the service rendered, though not sufficient to support the employee, has neither caused nor contributed to her poverty. On the contrary, to the extent of what he pays he has relieved it. In principle, there can be no difference between the case of selling labor and the case of selling goods. If one goes to the butcher, the baker or grocer to buy food, he is morally entitled to obtain the worth of his money but he is not entitled to more. If what he gets is worth what he pays he is not justified in demanding more simply because he needs more; and the shopkeeper, having dealt fairly and honestly in that transaction, is not concerned in any peculiar sense with the question of his customer's necessities. Should a statute undertake to vest in a commission

power to determine the quantity of food necessary for individual support and require the shopkeeper, if he sell to the individual at all,· to furnish that quantity at not more than a fixed maximum, it would undoubtedly fall before the constitutional test. The fallacy of any argument in support of the validity of such a statute would be quickly exposed. The argument in support of that now being considered is equally fallacious, though the weakness of it may not be so plain. A statute requiring an employer to pay in money, to pay at prescribed and regular intervals, to pay the value of the services rendered, even to pay with fair relation to the extent of the benefit obtained from the service, would be understandable. But a statute which prescribes payment without regard to any of these things and solely with relation to circumstances apart from the contract of employment, the business affected by it and the work done under it, is so clearly the product of a naked, arbitrary exercise of power that it cannot be allowed to stand under the Constitution of the United States."

Whether this would be equally or at all true in respect of the statutes of some of the states we are not called upon to say. They are not now before us; and it is enough that it applies in every particular to the Washington statute now under consideration.

The Washington statute, like the one for the District of Columbia, fixes minimum wages for adult women. Adult men and their employers are left free to bargain as they please; and it is a significant and an important fact that all state statutes to which our attention has been called are of like character. The common-law rules restricting the power of women to make contracts have, under our system, long since practically disappeared. Women today stand upon a legal and political equality with men. There is no longer any reason why they should be put in different classes in respect of their legal

right to make contracts; nor should they be denied, in effect, the right to compete with men for work paying lower wages which men may be willing to accept. And it is an arbitrary exercise of the legislative power to do so. In the *Tipaldo* case, 298 U. S. 587, 615, it appeared that the New York legislature had passed two minimum-wage measures—one dealing with women alone, the other with both men and women. The act which included men was vetoed by the governor. The other, applying to women alone, was approved. The "factual background" in respect of both measures was substantially the same. In pointing out the arbitrary discrimination which resulted (pp. 615–617) we said:

"These legislative declarations, in form of findings or recitals of fact, serve well to illustrate why any measure that deprives employers and adult women of freedom to agree upon wages, leaving employers and men employees free so to do, is necessarily arbitrary. Much, if not all, that in them is said in justification of the regulations that the Act imposes in respect of women's wages applies with equal force in support of the same regulation of men's wages. While men are left free to fix their wages by agreement with employers, it would be fanciful to suppose that the regulation of women's wages would be useful to prevent or lessen the evils listed in the first section of the Act. Men in need of work are as likely as women to accept the low wages offered by unscrupulous employers. Men in greater number than women support themselves and dependents and because of need will work for whatever wages they can get and that without regard to the value of the service and even though the pay is less than minima prescribed in accordance with this Act. It is plain that, under circumstances such as those portrayed in the 'Factual background' prescribing of minimum wages for women alone would unreasonably restrain them

in competition with men and tend arbitrarily to deprive them of employment and a fair chance to find work."

An appeal to the principle that the legislature is free to recognize degrees of harm and confine its restrictions accordingly, is but to beg the question, which is—since the contractual rights of men and women are the same, does the legislation here involved, by restricting only the rights of women to make contracts as to wages, create an arbitrary discrimination? We think it does. Difference of sex affords no reasonable ground for making a restriction applicable to the wage contracts of all working women from which like contracts of all working men are left free. Certainly a suggestion that the bargaining ability of the average woman is not equal to that of the average man would lack substance. The ability to make a fair bargain, as everyone knows, does not depend upon sex.

If, in the light of the facts, the state legislation, without reason or for reasons of mere expediency, excluded men from the provisions of the legislation, the power was exercised arbitrarily. On the other hand, if such legislation in respect of men was properly omitted on the ground that it would be unconstitutional, the same conclusion of unconstitutionality is inescapable in respect of similar legislative restraint in the case of women, 261 U. S. 553.

Finally, it may be said that a statute absolutely fixing wages in the various industries at definite sums and forbidding employers and employees from contracting for any other than those designated, would probably not be thought to be constitutional. It is hard to see why the power to fix minimum wages does not connote a like power in respect of maximum wages. And yet, if both powers be exercised in such a way that the minimum and the maximum so nearly approach each other as to

become substantially the same, the right to make any contract in respect of wages will have been completely abrogated.

A more complete discussion may be found in the *Adkins* and *Tipaldo* cases cited *supra*.