### SMOLOWE et al. v. DELENDO CORPORATION et al. (UNITED STATES, Intervenor).

District Court, S. D. New York.

Aug. 14, 1942.

Supplemental Opinion Nov. 12, 1942.

See, also, D.C., 36 F.Supp. 790.

Arthur J. Sleppin, of New York City, for plaintiff Smolowe.

Samuel A. Mehlman, of New York City (Arthur J. Sleppin and Jack Hart, both of New York City, of counsel), for plaintiff Levy.

Jay Leo Rothschild, of New York City (Louis Rivkin, of New York City, of counsel), for defendants.

Mathias F. Correa, U. S. Atty., of New York City (Chester T. Lane, Sp. Asst. to the Atty. Gen., and William L. Lynch, Asst. U. S. Atty., of New York City, of counsel), for United States, Intervenor.

Chester T. Lane, Gen. Counsel, of Washington, D. C. (Christopher M. Jenks, Asst. Gen. Counsel, of Philadelphia, Pa., Donald R. Seawell, of Washington, D. C., and Milton P. Kroll, of Philadelphia, Pa., of counsel), for Securities & Exchange Commission.

BRIGHT, District Judge.

These actions were brought by Philip Smolowe and M. William Levy, stockholders of the defendant Delendo Corporation, to recover for the corporation profits received between December 1, 1939, and June 1, 1940, by the defendants I. J. Seskis and Henry C. Kaplan, president and vice president respectively, and directors of the corporation, each owning approximately 12% of its common stock. The cases were consolidated and tried together without a jury.

The issues involve the interpretation and constitutionality of Section 16(b) of the "Securities Exchange Act of 1934". 48

Stat. 896, 15 U.S.C.A. § 78p(b), which reads:

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

Subdivision (a) of the same section requires every person who is directly or indirectly the beneficial owner of more than 10% of any class of any equity security (other than an exempted security) registered on a national securities exchange, or who is a director or an officer of the issuer of such security, to file a statement with the exchange and the Securities and Exchange Commission of the amount of equity securities of which he is the owner, and within ten days after the close of each current month thereafter to file another statement indicating his ownership and such changes therein as have occurred during such current month.

The facts are stipulated. Delendo was formerly the Oldetyme Distillers Corporation. Its name was changed to Delendo Corporation on May 22, 1940, in contemplation of dissolution, and it was dissolved

on June 28, 1940. During the period in question—December 1, 1939 to June 1, 1940 —the stock of the corporation was duly registered and listed on the New York Curb Exchange, which was and is a national securities exchange, as defined in the Act, and such stock was not an exempted security.

The individual defendants have been owners of common stock in the company since April 7, 1933. The defendant Seskis purchased 14,920 shares of the corporation's stock on January 19, 1940, from the Distillers & Brewers Corporation of America, paying $24,245. On February 28, 1940, he purchased 584 shares on the New York Curb Exchange, paying $905.- 20, the total purchase price of the two lots being $25,150.20. He had previously, and in 1936, borrowed from the Inwood Corporation (wholly owned by the defendant Kaplan), $54,536.03. He reduced that obligation by payments from. time to time, and completely paid it off on April 4, 1940, by transferring to Kaplan 15,800 shares of the stock of the corporation at $2.25 a share, a total of $35,550. The stock certificates actually delivered by Seskis to Kaplan were not the same as those acquired by Seskis during the period sued for, but were certificates of stock which had been acquired by the latter, some on August 3, 1934, and the balance on May 4, 1937. Plaintiff claims that having purchased 15,504 shares at $25,150.20, he sold 15,800 shares to Kaplan, making a profit upon the 15,504 shares of $9,733.80.

The defendant Kaplan, during the period in question, made the following purchases of the corporation's stock upon the New York Curb Exchange:

| December | 1, 1939 | 5,000 | shares | at | $ 7,750. |
|---|---|---|---|---|---|
| February | 5, 1940 | 200 | " | " | 285. |
| February | 20, 1940 | 200 | " | " | 335. |
| March | 25, 1940 | 400 | " | " | 924. |
| March | 27, 1940 | 1,000 | " | " | 2,560. |
| April | 11, 1940 | 300 | " | " | 768. |
| | | 7,100 | | | $12,622. |

He sold upon the same exchange during the same period, as follows:

| February | 15, 1940 | 200 | shares | at | $ 308.91 |
|---|---|---|---|---|---|
| April | 19, 1940 | 500 | " | " | 750.00 |
| April | 22, 1940 | 500 | " | " | 1,312.50 |
| May | 7, 1940 | 200 | " | " | 525.00 |
| May | 7, 1940 | 800 | " | " | 2,000.00 |
| May | 10, 1940 | 500 | " | " | 1,040.20 |
| May | 11, 1940 | 200 | " | " | 250.00 |
| May | 13, 1940 | 2,000 | " | " | 7,779.03 |
| May | 14, 1940 | 1,000 | " | " | 3,889.52 |
| | | 5,900 | | | $17,855.16 |

Sixteen hundred of the shares sold were identical certificates purchased during the period in question. The other shares were not. Plaintiff claims that the defendant Kaplan made a profit on the stock so purchased and sold during the period of $8,-305.16.

It is conceded that all purchases and sales by the individual defendants, above listed, were made within the State of New York. And it is not claimed or contended that either of the individual defendants acted in bad faith, or that they or either of them unfairly used any information obtained by them with respect to any of the transactions.

If the section quoted does not apply to the sales and purchases set forth, there will be no need to determine its constitutionality. The first question, therefore, is directed to the application of the section.

It seems to me that a particular aid in this respect would be to see what wrongs, practices or transactions Congress sought to prohibit, regulate or remedy. In section 2 of the Act, Congress found that transactions in securities on exchanges, or in over-the-counter markets were affected with a national public interest, and that it was necessary to provide for their regulation and control, including transactions by officers, directors and principal security holders. It deemed this necessary, among others, to protect interstate commerce, the national credit and the federal taxing power, as well as to protect and make more effective the national banking and Federal Reserve systems. It sought to "insure the maintenance of fair and honest markets in such transactions." Among other important elements, it distinctly recognized that such transactions constituted an important part of the current of interstate commerce, involved in large part securities of issuers engaged in interstate commerce, affected the national credit, and that the prices established and offered in such transactions constituted a basis for determining prices at which securities are bought and sold. Congress sought, among other things, to control excessive speculation, sudden and unreasonable fluctuations in prices, with their evils of unreasonable expansion and contraction of credit, and the precipitation, intensification and prolongation of national emergencies of unemployment and dislocation of trade and industry. These are some of the matters sought to be comprehended within the four

corners of the Act. They have particular significance to the questions here involved.

■ These findings of Congress are presumptively sound, and are to be taken as true unless overthrown by contrary findings of greater weight based on facts of common knowledge, or on other facts judicially noticed, or on facts proved by the parties asserting the invalidity of the statute. There are certainly no facts within my knowledge, or which I may judicially notice, or which have been called to my attention, or proven, which would justify me in disregarding or questioning these findings. Securities & Exchange Commission v. Torr, D.C., 15 F.Supp. 315–320, reversed on other grounds, 2 Cir., 87 F.2d 446; West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330.

Coming now to the section in question, it definitely applies to directors, officers and principal stockholders, either or both. A principal stockholder, under section 16 (a), is one who directly or indirectly owns more than 10% of any class of any equity security "which is registered on a national securities exchange". The section applies to an officer or director or a principal stockholder. In subdivision (b), another purpose, within the purposes generally stated in section 2, is stated—to prevent the unfair use of information which may have been obtained by such beneficial owner, director or officer by reason of his relationship to the issuer. It is not said that the loss of profits shall hinge upon a showing of unfair use. It does not make proof of such unfair use a requisite to the recovery by the issuer or by someone in its behalf. It seeks to remove the temptation to a possible use of such information by one or more of the three persons described. It is no more than a preamble (as defendants' counsel admits) to the "teeth" in the section.

■ Subdivision (b) in my opinion, clearly provides that any purchase and sale, or sale and purchase, within the period of six months, by either a beneficial owner or officer or director, if profitable, shall be for the benefit of the issuer, regardless of any showing of unfair use of inside information. Congress did not prohibit such transactions. It merely sought to remove the selfish incentive. It defined what is commonly called a "short swing" as one occurring within a period of six months. It is contended by defendants that sales and purchases and purchases and sales must be of identical certificates in order to bring them within the subdivision. Were such a construction to be adopted, the intention of Congress would clearly be destroyed. Persons engaging in the particular transaction could thus easily evade the subdivision by drawing upon a reserve of stock which he might have owned for some period of time, and which makes Section 16(a) and (b) applicable to him. If, after a sale, he repurchased, the possibility of his receiving the identical certificates would be so remote that again the section would have no application. Such a construction could not have been intended by Congress. And it loses sight of the fact that stock certificates are fungible. Richardson v. Shaw, 209 U.S. 365, 28 S.Ct. 512, 52 L.Ed. 835, 14 Ann.Cas. 981.

■ The defendant Seskis further contends that there was no sale when he paid off his debt to Kaplan by transferring 15,800 shares to him. The provisions in subdivision (b) cannot be given such a restricted meaning. The definition of sale in section 3(a) (14), clearly contemplates a sale "or other disposition" of the security. He further contends that such purchase and sale and sale and purchase must be made upon a national exchange, and that but 584 shares of his were so transacted. Subdivision (b), however, does not so limit the transaction; and subdivision (a) obviously makes the section applicable to an equity security "which is registered on a national securities exchange", as it is admitted the stock in question here was. And, finally, he contends that his transfer of 15,800 shares to Kaplan comes within the exemption—"unless such security was acquired in good faith in connection with a debt previously contracted". The exemption clearly relates to equity securities "acquired" and not to equity securities sold or otherwise disposed of. It does benefit the defendant Kaplan.

It seems clear to me that the subdivision as written clearly brings the transactions complained of within its terms, and that plaintiffs are entitled to recover for the benefit of their corporation, the profits received by the individual defendants during the period mentioned, if the section is constitutional.

The contentions of the defendants in that respect are that if the subdivision is construed to apply to the transactions of

the character shown, (1) it deprives the individual defendants of property without due process of law in violation of the Fifth Amendment to the Constitution; (2) that as all of the transactions occurred within the State of New York, they are no part of interstate commerce as contemplated by clause 3 of Section 8 of Article I, and the Tenth Amendment to, the Constitution; and (3) that the exemptive power conferred by the last sentence of subdivision (b) constitutes an unlawful delegation of legislative power to the Securities & Exchange Commission, in violation of Section 1 of Article I, and paragraph 18 of Section 8 of Article I of the Constitution.

■ In considering these questions, it seems to me that it must be borne in mind that Congress, in dealing with officers and directors and principal stockholders of a corporation, was legislating with reference to persons whose conduct was not governed by the ordinary rule of the market place. These individuals were acting in a fiduciary capacity, exercising powers in trust. Pepper v. Litton, 308 U.S. 295, 306, 311, 60 S.Ct. 238, 84 L.Ed. 281; Pink v. Title Guarantee & Trust Co., 274 N.Y. 167, 8 N.E.2d 321. By well settled law, long expressing the public policy of this country, they would not be permitted to profit by reason of their fiduciary position or because of the knowledge or influence which might attend them in their office; in other words, they could not use such relation to the corporation for their own personal advantage. This principle is illustrated by the cases of Blum v. Fleishhacker, D.C., 21 F.Supp. 527–531; Strong v. Repide, 213 U.S. 419–432, 29 S.Ct. 521, 53 L.Ed. 853; Goodwin v. Agassiz, 283 Mass. 358, 186 N. E. 659; New York Trust Co. v. American Realty Co., 244 N.Y. 209–219, 155 N.E. 102; Bray v. Jones, 190 Wis. 578, 209 N. W. 675; Kelsey v. New England Street Railway Co., 62 N.J.Eq. 742, 48 A. 1001; Porter v. Healy, 244 Pa. 427, 91 A. 428–432; Dawson v. National Life Insurance Co., 176 Iowa 362, 157 N.W. 929, L.R.A. 1916E, 878, Ann.Cas.1918B, 230.

■ It is true that the courts have not gone so far as to apply the principle to transactions in stock by officers, directors or principal stockholders when the corporation or its stockholders was not involved. Congress, however, has seen fit to go one step further, and that step a short one. It does not prohibit such transactions. It merely removes the profit to the individual.

After the extensive investigation made in affairs of this kind, Congress certainly had before it the salutary principle stated in the cases cited, and in many others which have almost universally adopted them. It doubtless felt, because of the tremendously difficult times through which this nation had passed since 1929, that some regulation of stock markets was needed; that that regulation should not only be extended to the exchanges themselves, but to any transaction which might or could influence prices thereon, and which might or could invite or incite excessive speculation. By its very statement and finding mentioned, the Act in part was particularly aimed at short swings by those holding a fiduciary relationship to corporations whose securities have a national character, and which persons, because of their position, were presumed to have inside information. It appreciated that while many of their individual transactions might not be upon the exchanges, those transactions could not fail to have some effect upon prices both upon the exchange, and as the basis for credit and taxes. It concluded, therefore, to take one step further than the cases previously had gone. Chenery Corp. v. Securities & Exchange Commission, App.D.C., 128 F.2d 303–308. The decision there related to an order made by the Commission, which it claimed went beyond its authority to make. Here the change was made by Congress.

■ 1. As to want of due process. The defendants contend that the effect of the subdivision in question is to create a conclusive presumption of using inside information which penalizes the defendants, without opportunity on their part to be heard to show that at no time did they violate any of their obligations to the corporation. There does not seem to me to be anything to this contention. There is no irrebuttable presumption created by this section. It obviously directs that the profits, obtained by persons in the fiduciary clause mentioned, shall go to their corporation whether or not they were obtained by the use of inside information. And here there is no need for any proof of the defendants' interest or purpose; it is admitted that there was no bad faith or use of such information. The defendants then contend that there is, because of this construction, a forfeiture of property interests in a subject matter which was never the corporation's, or within the field of its opportunities—in fact, in a field which normal-

ly would be forbidden to the corporation, —and, therefore, the section is arbitrary and invalid; it interferes with vested rights in the use of stock acquired prior to the effective date of the statute, or subsequent thereto but before the six months' period, and in the acquisition of profits in the disposition of the same. It will extend this opinion, already too long, to take up each of the points urged. Suffice it to say that in the attempted solution of a difficult problem which Congress had before it, and after a thorough investigation of the matters and things involved in it, which undoubtedly had their impact upon the economical, financial and perhaps moral problems of the nation, more completely set out in Section 2 of the Act, the statute in question was adopted. Its effort to cure or at least rectify these problems should receive from the courts an attitude of helpful cooperation (Tigner v. Texas, 310 U. S. 141, 60 S.Ct. 879, 84 L.Ed. 1124, 130 A.L.R. 1321), and if the result of its efforts is not "arbitrary or capricious and that is all we have to decide", and the regulation is reasonable in relation to its subject and is adopted in the interest of the community, due process has been preserved. West Coast Hotel Co. v. Parrish, 300 U.S. 379–399, 57 S.Ct. 578, 585, 81 L.Ed. 703, 108 A.L.R. 1330. Legislation restricting speculation is not within the prohibited constitutional field. Booth v. Illinois, 184 U.S. 425, 22 S.Ct. 425, 46 L. Ed. 623; Otis v. Parker, 187 U.S. 606, 23 S.Ct. 168, 47 L.Ed 323. That the transaction involved stock acquired prior to the passage of the Act or prior to the six months' period, is no barrier. Uebersee Finanz-Korporation, etc., v. Rosen, 2 Cir., 83 F.2d 225, 230. This legislation is not arbitrary or capricious in my opinion. Congress has decided that the complications in business life as revealed by their investigation, require the extension of the principle of fiduciary relationship to the dealings by corporate officers, directors or principal owners of stock in their own corporations, that extension being only to loss of profits in transactions conducted within a fixed period. It has deemed such extension necessary for other reasons than those based upon the existence of a trust relation. In my judgment, the Constitution and its Amendments are sufficiently elastic to encompass the advance.

█ █ 2. No interstate commerce. is involved. It must not be forgotten that Section 16 is made applicable to equity securities registered on a national exchange, as the stock in this corporation concededly was. It is also well to remember that the defendant corporation is a Delaware corporation, doing business also in the State of New York. This argument cannot apply to the defendant Kaplan. The bulk of the Seskis transactions consisted in the delivery of stock to Kaplan's corporation, in payment of a debt. It was delivered at a price. It was a delivery of a stock then registered upon a national exchange. It was in payment of a credit theretofore extended. It was stock of a corporation then engaged in business in more than one state. The use of inside information has its bearing upon the attempted establishment of fair and honest markets, which, of course, are in all respects interstate, and the sale of stock wherever made can, and in many instances does, reflect its price in other markets, or in channels of credit, and certainly in federal taxation. Congress may choose the means reasonably adapted to the attainment of the permitted end, and has the power needed to make its regulations effective by extending them to activities intrastate which affect interstate commerce. United States v. Darby, 312 U. S. 100–121, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; Wrightwood Dairy Co. v. United States, 315 U.S. 110–119, 62 S. Ct. 523, 86 L.Ed. ——. The very stock sold and purchased here was tinged with an interstate character, issued in Delaware, sold in New York, and dealt in on a national exchange; and was of a sufficiently interstate character to justify legislation such as that now in question. Securities & Exchange Commission v. Torr, supra.

█ 3. The exemptive provision as constituting an unlawful delegation of power. I am frank to say I do not see how this has any materiality here. There is no claim of improper exemption or want of exemption. It is difficult to see how the defendants are in any way concerned with the clause criticized; it has not operated to injure them or to deprive them of any constitutional right. Gorieb v. Fox, 274 U.S. 603–606, 607, 47 S.Ct. 675, 71 L.Ed. 1228, 53 A.L.R. 1210. But assuming that it is material now to discuss this grant of legislative power, so-called, there is nothing uncertain or indefinite about it. The Commission is authorized to declare transactions decided by it to be exempt "as not comprehended within the purpose of this subsection". The purpose of the subsection is declared in the first part of it, to prevent the unfair use of information obtained by a beneficial owner, director or

officer by reason of his relation to the issuer. It is difficult to see, how it could be more accurately defined or limited. Wright v. Securities & Exchange Commission, 2 Cir., 112 F.2d 89–94. United States v. Shreveport Grain & Elevator Co., 287 U. S. 77–85, 53 S.Ct. 42, 77 L.Ed. 175.

The only remaining question is one of damages. The subdivision in question makes recoverable by or in behalf of the corporation "any profit realized * * * from any purchase and sale, or any sale and purchase, * * * within any period of less than six months". The purchase and sale by the defendant Seskis present no problem. There were but two purchases, one of 14,920 shares for $24,245, and the other of 584 shares for $905.20, a total of 15,504 shares for $25,150.20. These 15,504 shares, with others, were sold or otherwise disposed of at $2.25 per share, a total sale price of $34,884. The profit recoverable from the defendant Seskis is, therefore, $9,733.80.

 The determination of the profits received by Kaplan is not so simple. The subsection carefully states that profits are to be computed from "any" purchase and sale or "any" sale and purchase within the six months. It does not say that any purchase is to be set off against the next sale nor that any rule of "first in and first out" shall be adopted. The purpose of the statute was to make unprofitable short swings by persons in a position to have inside information. If they saw fit to disobey the law, there is no reason why the recovery should be minimized. The rule to be adopted must disregard the identity of the certificates, as I have previously stated. The computation suggested by the Securities & Exchange Commission is, therefore, adopted as fixing the amount of profits recoverable from the defendant Kaplan. But in doing so, it is necessary to refer to other stock transactions of Kaplan during the six months period. Of the 15,800 shares acquired by him from Seskis on April 4, 1940, at $2.-25 per share, 15,583 shares were acquired in connection with a debt previously contracted. The remaining 217 shares were acquired by him for cash in the amount of $488.97. On April 16, 1940, Kaplan sold the $15,800 shares, at $2.25 per share, in three blocks. That sale may be matched against any other purchase at a lower price during the period, except that it may not be matched against any portion of the block taken in connection with the debt.

Matching the purchases and sales mentioned the following tabulation results:

| | Bought | | | Sold | |
| Date | No. Shares | Amount | Date | Amount | Profit |
|---|---|---|---|---|---|
| 2/5/40 | 200 | $ 285.00 | 5/14/40 | $ 777.90 | $ 492.90 |
| 12/1/39 | 800 | 1,240.00 | " | 3,111.62 | 1,871.62 |
| " | 2,000 | 3,100.00 | 5/13/40 | 7,779.03 | 4,679.03 |
| " | 500 | 775.00 | 4/22/40 | 1,312.50 | 537.50 |
| " | 200 | 310.00 | 5/7/40 | 525.00 | 215.00 |
| " | 800 | 1,240.00 | " | 2,000.00 | 760.00 |
| " | 500 | 775.00 | 4/16/40 | 1,125.00 | 350.00 |
| " | 200 | 310.00 | " | 450.00 | 140.00 |
| 2/20/40 | 200 | 335.00 | " | 450.00 | 115.00 |
| 4/4/40 | 217 | 488.25 | " | 488.25 | 0. |
| 3/25/40 | 283 | 653.73 | " | 636.75 | −16.98 |
| | 5,900 | $9,511.98 | | $18,656.05 | $9,144.07 |

The profit chargeable against the defendant Kaplan is, therefore, $9,144.07.

Judgment in favor of the plaintiff is directed accordingly. The plaintiff may propose findings of fact and conclusions of law and serve the same upon the defendants' attorney, who may within five days thereafter present such objections thereto as he wishes. The court will make the final findings and conclusions.

### Supplemental Opinion.

 Since the writing of my opinion in this case, my attention has been called to an inconsistency. The section of the statute in question, Securities Exchange Act of 1934, § 16(b), 15 U.S.C.A. § 78p(b), provides that as to transactions within the six months "*any* profit realized * * * shall inure to and be recoverable by the issuer". The statute obviously precludes the setting off of any losses during that period. My computation of the amount to be recovered from the defendant Kaplan should, therefore, be changed by striking out the last two sales which will increase the profits by $16.98 to $9,161.05. I do not think interest should be awarded.

 Plaintiffs' attorney and counsel ask for an allowance for their services and disbursements to be paid by the Delendo Corporation out of the fund to be realized under the judgment herein. There is ample authority, in my opinion, for such an allowance. Trustees v. Greenough, 105 U.S. 527, 532, 26 L.Ed. 1157; Sprague v. Ticonic Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L. Ed. 1184; McCourt v. Singers-Bigger, 8 Cir., 145 F. 103–114, 7 Ann.Cas. 287; Meighan v. American Grass Twine Co., 2 Cir., 154 F. 346; Schoenherr v. Van Meter, 215 N.Y. 548–552, 109 N.E. 625; 39 Columbia Law Review 784. Plaintiff's attorney and counsel are granted an allowance of $3,-000, and of $78.98 for their disbursements.