Ex parte DALTON HERRIN.

No. A-9583. Aug. 4, 1939.

(93 P. 2d 21.)

J. T. Dickerson, of Tulsa, and L. V. Reid and Rayford S. Reid, both of Oklahoma City, for petitioner.

Mac Q. Williamson, Atty. Gen., and Fred Hansen, Asst. Atty. Gen., for the State.

BAREFOOT, J. This is an original application for a writ of habeas corpus upon the part of Dalton Herrin, petitioner, who alleges that he is restrained of his liberty, and unlawfully imprisoned in the county jail by the sheriff of Oklahoma county, Okla. That the cause of said restraint and imprisonment is by reason of a commitment issued by the court of common pleas of said county, by virtue of an information charging defendant with the crime of violating section 12, chapter 24, article 2, of the 1937 Session Laws, O.S.A., title 59, § 91 et seq.

The above act was enacted for the purpose of regulating and controlling the barber industry, conferring upon the State Board of Barber Examiners powers and jurisdiction with relation thereto, defining such powers, jurisdiction and duties, authorizing the board to approve agreements, and to make orders fixing minimum prices for barber work, after investigation by the board, in certain designated localities, under rules and regulations prescribed by the board, and after notice to the party or parties affected. Section 12 of the act, O.S.A., title 59, § 102, provides:

"(a) The board shall have the power to approve price agreements establishing minimum prices for barber work, signed, and submitted by any organized groups of at least seventy-five per centum (75%) of the duly licensed, registered and practicing barbers of any city or town of one thousand (1,000) population or more according to the last Federal Decennial Census, after ascertaining by such investigations, and proofs as the condition permits and requires, that such price agreement is just, and under varying conditions, will best protect the public health and safety by affording a sufficient minimum price for barber work to enable the barbers to furnish modern and healthful service and appliances, so as to minimize the danger to the public health incident to such work.

"The board shall take into consideration all conditions affecting the barber profession in its relation to the public health and safety.

"In determining reasonable minimum prices, the board shall take into consideration the necessary costs incurred in the particular city or town affected by this act in maintaining a barber shop in a clean, healthful and sanitary condition.

"(b) The board, after making such investigation, shall fix, by official order, the minimum price for all work usually performed in a barber shop.

"(c) That if the board, after investigation made either upon its own initiative or upon the complaint of a representative group of barbers, determines that the minimum prices so fixed are insufficient to properly provide healthful services to the public and keep the shops sanitary, then the board from time to time shall have authority to vary or refix the minimum prices for a barber's work in each city or town affected by this act."

It is for a violation of the above section that petitioner was charged by information, after notice had been served upon him in accordance with the rules prescribed by the board, and after 75 per cent. of the duly licensed, registered and practicing barbers in the city of Edmond, Oklahoma county, had requested an order for the establishment of a minimum price of 35 cents for the cutting of hair in said city, and said minimum price had been put in force and effect after investigation, as provided in the act as aforesaid.

Section 8, chapter 24, article 2, 1937 Session Laws, O.S.A., title 59, § 98, provides:

"Violations: Remedies: That a violation of any provision of this act or of any rule, when a written certified copy of said rule has been served upon the person violating said rule, subpoena or order of the board lawfully made pursuant hereto, except as otherwise expressly provided by this act, shall be a misdemeanor punishable by a fine not less than twenty-five ($25.00) dollars and not exceeding three hundred ($300.00) dollars, or by imprisonment not exceeding six (6) months, or both.

"The board may institute such actions in the courts of competent jurisdiction as may appear necessary to en-

force compliance with any provision of this act or to enforce compliance with any rule, subpoena or order of the board made pursuant to the provisions of this act, and in addition to any other remedy may apply to any district court of competent jurisdiction for relief by injunction."

Under the terms of the above act the Board of Barber Examiners brought an injunction suit against petitioner in the district court of Oklahoma county, seeking to enjoin him from a violation of the above act. With this action pending, petitioner filed an original application in the Supreme Court of this state, seeking a writ of prohibition to prohibit the district court of Oklahoma county from making any further orders in said suit, and alleging as grounds therefor that said act was unconstitutional and void upon the grounds hereinafter stated. The Supreme Court found that a sufficient showing had been made to invoke the jurisdiction of that court, and on July 26, 1938, in the case of Herrin et al. v. Arnold, District Judge, 183 Okla. 392, 82 P. 2d 977, in an opinion by Justice Gibson, upheld the constitutionality of the above act, and in a later opinion, November 11, 1938, in the case of Vandervort et al. v. Keen, District Judge, 184 Okla. 121, 85 P. 2d 405, the Supreme Court followed the opinion in the Herrin Case. The decisions in both cases were by a divided court of four to three.

This case is before this court on the application for a writ of habeas corpus as heretofore stated. The application was submitted on the same grounds submitted to the Supreme Court of this state. The briefs filed in the Supreme Court by all parties have been filed in this court. Attorneys for petitioner and for respondent stated, that it is the desire of all parties, that the Criminal Court of Appeals of this state pass upon the constitutionality of the above act.

There has never been but at one time a serious conflict between this court and the Supreme Court of this state as to their respective jurisdictions. This conflict was

settled as far as this court was concerned in the case of Ex parte Owens, 37 Okla. Cr. 118, 258 P. 758. Since that time there has been almost a universal understanding that the Supreme Court would exercise "exclusive jurisdiction" in civil matters, and of extraordinary writs arising under that jurisdiction in civil cases, and that the Criminal Court of Appeals had "exclusive jurisdiction" in criminal cases and to the extraordinary writs arising under that jurisdiction. Ex parte Justus, 26 Okla. 101, 110 P. 907; Herndon v. Hammond, 28 Okla. 616, 115 P. 775; State v. Brown, 8 Okla. Cr. 40, 126 P. 245, Ann. Cas. 1914C, 394; Smythe v. Smythe, 28 Okla. 266, 114 P. 257; Corley v. Adair County Court, 10 Okla. Cr. 104, 134 P. 835.

Section 8, of the act above quoted, O.S.A., title 59, § 98, specifically provides: "* * * and in addition to any other remedy may apply to any district court of competent jurisdiction for relief by injunction." This was the remedy sought in the case before the Supreme Court, and that court properly assumed jurisdiction to hear and determine the constitutionality of the act referred to above. Under the decision of this court in the Ex parte Owens Case, this court, having been created by the Constitution, and by the Legislature been given the right to issue writs of habeas corpus, has the right to assume jurisdiction, and pass upon the constitutionality of the above act, and as to whether or not defendant is being prosecuted criminally by a statute that is valid or void, under the terms of the Constitution of this state, and the United States. This right is elaborately discussed by Judge Doyle in the Ex parte Owens Case, where the authorities from this state, and many other states, and noted authorities are not only compiled, but are freely quoted from.

In assuming the responsibility of passing upon the constitutionality of the above act, which has been passed upon by our sister court upon two occasions, and by a divided court of four to three, we realize the responsi-

bility that has been placed upon us. This coupled with the far-reaching effect that a decision upon this question will have, has caused us to read and investigate with extraordinary care, the splendid briefs presented by both sides of the controversy, and the many decisions cited therein.

The issues here involved resolve themselves into three propositions:

First: Does the act here violate section 59, article 5, of the Oklahoma Constitution, Okla. St. Ann., relating to the passage of special and general laws?

Second: Does the act violate section 1, article 4, and section 1, article 5, of our state Constitution, prohibiting the unlawful delegation of legislative power?

Third: Does the act, and especially section 12, thereof, violate section 2, article 2 and section 7, article 2, of our state Constitution, and the 5th and 14th Amendments to the Constitution of the United States, U.S.C.A.; all of which provide that "No person shall be deprived * * * liberty, or property, without due process of law," which provision, the courts hold, includes a guarantee against interference with the liberty (freedom) of contract.

Article 5, section 59, of the Constitution provides:

"Laws of a general nature shall have a uniform operation throughout the state, and where a general law can be made applicable, no special law shall be enacted."

This provision has been construed by the courts of this state in many cases. In the case of Peters v. State, 56 Okla. Cr. 95, 34 P. 2d 286, 289, this court has practically decided the question here involved. It is there said:

"Under the act in question the Legislature has seen fit to place the barber shops of this state in two classes: (a) Those in cities and incorporated towns; (b) those not in cities and incorporated towns. Did such a classification destroy uniformity of operation of the law? The

law acts uniformly throughout the state on all barber shops within class A and likewise operates alike on all those barber shops coming within class B.

"Uniformity of operation as used in section 59, art. 5, Oklahoma Constitution, Okla. St. Ann., requires that laws shall have uniformity of operation throughout the state, but does not require 'universality of operation'; the former relating to similarity of conditions affecting subjects or localities of the state that are appropriately classified; the latter relating to the whole and every part of the state."

The Supreme Court of this state has also construed the above provisions in the following cases, which are in harmony with the views expressed in the Peters Case: Anderson v. Ritterbusch, 22 Okla. 761, 98 P. 1002; Grable v. Childers, 176 Okla. 360, 56 P. 2d 357; In re Annexation of Reno Quartermaster Depot Military Reservation to Independent School District No. 34, Canadian County, 180 Okla. 274, 69 P. 2d 659. See, also, Noffzigger v. McAllister, 12 Kan. 315.

The act creating the Barber Board of this state, provided that on petition of at least 75 per cent. of the barbers of any city or town of one thousand population or more, according to the last Federal Decennial Census, and after an investigation by said board, minimum prices may be prescribed. It will be noted that the act applies to "any" city or town of one thousand population or more. It does not apply to any "special" city or town.

It is a general rule of law that where it relates to a class, it must be general in its application to the class; it must operate uniformly as to all the persons or subjects included, and all the class within like circumstances must come within its operation. 59 C. J. 728. The classification must not be capricious or arbitrary, and must be reasonable and pertain to some peculiarity in the subject matter calling for the legislation. Dillon, in his work on Municipal Corporations, sec. 151, says:

"But classification by population cannot be made arbitrarily and without reason. There must be some reason in the nature of things for the distinctions adopted. The size of the municipality, as evidenced by its population, must have a reasonable relation to the subject-matter of the legislation, and must furnish some very apparent reason for legislation differing from that applicable to other municipalities having a substantial difference in population."

In 7 American Jurisprudence, p. 616, § 6, the rule is stated:

"It is competent for the Legislature to classify barbers according to the population of the communities within which they conduct their business and, as classified, to prescribe different regulations governing their occupation. Such a law does not violate constitutional requirements that laws of a general nature shall have uniform application throughout the state. One reason for permitting such classification is that the spread of disease by insanitary barbers or barbershops affects more people in large towns or cities than in small ones; another is that the character of barbers and barbershops is more generally known in villages than in large towns."

Harris v. State, 56 Okla. Cr. 105, 34 P. 2d 289; Cooper v. Rollins, 152 Ga. 588, 110 S. E. 726, 20 A.L.R. 1105; State v. Sharpless, 31 Wash. 191, 71 P. 937; 96 Am. St. Rep. 893; Note, 20 A.L.R. 1102; Note, 98 A.L.R. 1090; Note, 40 L.R.A., N.S., 632. A reading of the above cases will clearly demonstrate that the act here in question is not in violation of section 59, article 5, of the state Constitution, relating to the passage of general and special laws.

It is next contended that the act in question violates section 1, article 4, and section 1, article 5, of the state Constitution, Okla. St. Ann., which are similar to sections 1 and 8, article 1, of the Constitution of the United States, U.S.C.A., which prohibit the unlawful delegation of legislative power. These provisions are as follows:

"The powers of the government of the state of Oklahoma shall be divided into three separate departments:

The legislative, executive, and judicial; and except as provided in this Constitution, the legislative, executive, and judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others."

"The legislative authority of the state shall be vested in a Legislature, consisting of a Senate and a House of Representatives; but the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature."

This contention of counsel for petitioner is based upon two recent decisions of the Supreme Court of the United States, viz.: Schechter Poultry Corporation v. United States, 295 U. S. 495, 55 S. Ct. 837, 79 L. Ed. 1570, 97 A.L.R. 947, being the decision holding unconstitutional the provisions of N.R.A. Code, and the case of Panama Refining Company v. Ryan, 293 U. S. 388, 55 S. Ct. 241, 79 L. Ed. 446, construing the petroleum code of the same act. We have carefully read and reread these decisions, and have come to the conclusion that the decisions in these cases are in no way in conflict with a decision upon the facts in the instant case, which holds that the act here in question is not a delegation of legislative power by the Legislature of this state, and not in conflict with the provisions of the Constitution of this state.

In the Schechter Case, the syllabus, which relates to the question of delegation of legislative power, states:

"3. Legislative power is unconstitutionally delegated by the provisions of § 3 of the National Industrial Recovery Act of June 16, 1933, authorizing the making of codes for the government of trades and industries by or with the approval of the President of the United States, without setting up any standards aside from the statement of the general aim of rehabilitation, correction and development of trades and industries.

"4. So long as a policy is laid down and a standard established by a statute, no unconstitutional delegation of legislative power is involved in leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply."

It will be noted from section 4 of said syllabus that where a policy is laid down by the Legislature, and a standard established, no unconstitutional delegation of legislative power is involved in leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy is to apply. This is exactly what has been done in the act here under consideration. By section 1, the general aim, need and purpose of the act is determined by the Legislature; that conditions have arisen by reason of unfair competition, for those working in the barber trade to support and maintain reasonably safe and healthful barbering service to the public, and "that such conditions constitute a menace to the health, welfare and reasonable comfort of the inhabitants of this state, and tend to the transmission of disease." By section 12, the policy of the Legislature is further determined, and a definite standard is established, viz.: that minimum prices for barber work may be established in certain definite localities in this state, after ascertaining the necessity therefor, by investigation of a duly authorized board. The "selected instrumentalities" as referred to in the syllabus, is the "Barber Board," which is given the power, within prescribed limits, to investigate the facts, and apply the policy as declared by the Legislature.

The contention of petitioner that the act does not confer a mandatory duty upon the board to investigate before establishing the minimum prices, is untenable. Section 12 (b) provides: "The board, after making such investigation, shall fix, by official order, the minimum price for all work usually performed in a barber shop."

The statement in section (a) of the act: "After ascertaining by such investigations, and proofs as the condition permits and requires, that such price agreement is just, and under varying conditions," is not a limitation upon the terms of section (b) above quoted. The whole act indicates that an investigation is to be conducted by the board, upon the presenting of a petition by 75 per cent. of the duly licensed, registered and practicing barbers of any city or town of one thousand population or more.

The decision in the Panama Refining Company Case does not in any way conflict with the conclusion herein reached, and by a reference to the Schechter Case, which reviews at length the decision in the Panama Refining Company Case, it will be noted that Chief Justice Hughes shows conclusively that the two decisions are in harmony, and that if by the terms of the National Recovery Act, 48 Stat. 195, Congress had laid down a policy, and established a standard, no unconstitutional delegation of legislative power would have been involved, for the reason that a prescribed board was established to determine certain facts in carrying out the declared policy of the Legislature.

It is unnecessary for us to unduly lengthen this opinion by quoting from the many decisions of the United States Supreme Court, and the other state and federal courts bearing upon this proposition. Counsel, in their briefs for petitioner and for the state, can and have referred to isolated sections of different opinions, which not only tend to, but do, bear out the contentions which they make. It becomes necessary to read all of these opinions, together with the dissenting opinions therein, for one to come to what he determines is a correct conclusion, as to the issues under consideration. Chief Justice Hughes reviews these decisions in both the Schechter and the Panama Refining Company Cases; and gives a complete, detailed

history of the different cases as they have arisen before the courts of this country. An exhaustive note appears in 79 L. Ed. 474, in which is discussed by the author the question of "Delegation of Legislative Power," and the most noted cases from the different Supreme Courts of the states and the United States are reviewed. On page 530, the topic, "Regulations as to wages and hours and conditions of work," is discussed, and leading cases cited. From a reading of the above-cited cases and the many cases cited therein, we have come to the conclusion that the Legislature of this state, by the enactment of article 2, chapter 24, p. 48, of the Oklahoma Session Laws of 1937, for the purpose of fixing minimum prices for barber work in cities of Oklahoma having in excess of 1000 population, as shown by the last Federal Decennial Census, did not act in conflict with section 1, article 4, and section 1, article 5, of the Constitution of this state. United States v. Grimaud, 220 U. S. 506, 509, 31 S. Ct. 480, 55 L. Ed. 563; Wayman v. Southard, 10 Wheat. 1, 42, 6 L. Ed. 253, 262; Brodbine v. Revere, 182 Mass. 598, 599, 66 N. E. 607. See, also, Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469; and West Coast Hotel Company v. Parrish, 300 U. S. 379, 57 S. Ct. 578, 81 L. Ed. 703, 108 A. L. R. 1330.

The last and main contention of petitioner is that the act in question is invalid as not coming within the "police power," and violates section 2, article 2, of the Constitution of the state, which provides: "All persons have the inherent right to * * * the enjoyment of the gains of their own industry," and violates section 7, article 2, of the state Constitution, and the 5th and 14th Amendment of the Constitution of the United States, which provides: "No person shall be deprived of * * * liberty, or property, without due process of law," and which provision the courts hold, includes a guaranty against interference with the liberty (freedom) of contract.

With special reference to the Barber Law of this state, the highest courts of Oklahoma have had under consideration its provisions in the following cases: Nation et al. v. Chism, 154 Okla. 50, 6 P. 2d 766; Ex parte Benight, 53 Okla. Cr. 293, 11 P. 2d 208; Peters v. State, 56 Okla. Cr. 95, 34 P. 2d 286; and the case of Herrin et al. v. Arnold, 183 Okla. 392, 82 P. 2d 977. In each of these cases the validity of the legislation has been upheld, and the Peters Case specifically held that under the police power of this state the Legislature had the authority to regulate the practice of barbers in this state, and to pass certain safeguards around said practice, and for the licensing and physical examination of those engaged in such practice in order to prevent the spread of contagious and infectious diseases. All of these decisions were prior to the Act of 1937, with the exception of the Herrin Case. Section 12 of that act provided for the establishment of minimum prices. These decisions are not only in accord with the spirit and age in which we live, but are supported by the great weight of modern authority, and the soundest reasoning. American Jurisprudence, vol. 7, pp. 613, 614, states the modern rule clearly, in the following language:

"It is well established that professions or trades operating directly on the person and thereby directly affecting the health, comfort, and safety of the public may be regulated by the Legislature under the police power, which enables the Legislature to make all needful rules and regulations for the health, safety and welfare of the people of the state. The occupation of barber or beauty culturist is embraced in this general principle; it is a lawful business, yet it is an occupation which, because of its intimate relation to the public health, is within that class of trades, professions, or callings which may, under the police power, be regulated by law without depriving a citizen of his natural rights and privileges guaranteed by fundamental law; those who are engaged therein are subject to regulations which require barbershops and beauty parlors to be operated in a clean and sanitary manner and by competent operators, to the end that the public may be protected against the spread of communicable diseases. Such

regulations may be prescribed by legislative act or by municipal ordinance under legislative authority granting the municipality the right to exercise general police powers. Statutes of this kind do not violate constitutional provisions that 'laws of a general nature shall have uniform operation throughout the state,' nor do they violate the equal protection clauses of the federal or the state Constitution. * * *

"What regulations shall be made are largely questions for the legislative body to determine; and unless those made are unreasonable and extravagant in their nature and purpose, or arbitrarily interfere with or destroy the property or personal rights of citizens, they will be sustained by the courts, even though they may be unwise, inexpedient, or place a needless restriction upon those who desire to learn the barber's trade. The Legislature cannot, however, under guise of its police power, impose upon barbershops and beauty parlors unreasonable, capricious, or arbitrary regulations having no relation to the public health or welfare or, under guise of regulation, destroy that profession. * * *"

With the law so clearly stated and the authorities supporting it cited, the question arises:

"Does section 12 of the act under consideration, in providing that 75 per cent. of the barbers of the cities or towns of this state having a population in excess of 1,000 may petition the Barber Board to establish a minimum wage in said city or town, who after a full and complete investigation, may establish such minimum prices which they deem reasonable and just, to the end that the barbers in those communities may furnish modern and healthful services and appliances, so as to minimize the danger to the public health incident to such work, conflict with the provisions of the Constitution of this state and the United States, above quoted?"

In the reading of the opinions in the cases from the different courts, and especially those which have had before them laws in reference to the establishment of minimum wages in the barber trade, it is possible to point out certain paragraphs which, if taken alone would be strong argument either for or against the sustaining of the law.

This is also true of the many decisions of the Supreme Court of the United States. And strong arguments may, and are, presented in this case, supported by the decisions of eminent jurists, not only from the different states of the Union, but by the Judges of the Supreme Court of the United States. And there can be no question but that as there are changes in the personnel of the Judges of the Supreme Court of the United States, there are fundamental changes in the decisions of that high court. This is illustrated by the decision in the Income Tax Cases, and many other noted illustrations might be given. It is illustrated in recent years by the decision in the West Coast Hotel Company Case, supra, which overruled the case of Adkins v. Children's Hospital of District of Columbia, 261 U. S. 525, 43 S. Ct. 394, 67 L. Ed. 785, 24 A.L.R. 1238, and upon which the Supreme Court of this State relies for its decision in upholding the act of the Legislature of Oklahoma in the instant case. There can be no question as to a direct change of principles in that case, as the opinion of Chief Justice Hughes follows the dissenting opinion of Chief Justice Taft, in the Adkins Case, and establishes that the opinion in the Adkins Case was based not only upon a wrong construction of the former cases of the Supreme Court, but also is not in accord with the times and conditions in which we now live.

The decisions of the six Supreme Courts, Duncan v. City of Des Moines, 222 Iowa, 218, 268 N. W. 547; City of Mobile v. Rouse, 27 Ala. App. 344, 173 So. 254, Id., 233 Ala. 622, 173 So. 266, 111 A. L. R. 349; State ex rel. Fulton v. Ives, 123 Fla. 401, 167 So. 394; Ex parte Kazas, 22 Cal. App. 2d 161, 70 P. 2d 962; Board of Barber Examiners v. Parker, 190 La. 214, 266, 182 So. 485; Herrin v. Arnold, District Judge, 183 Okla. 392, 82 P. 2d 977, which have had under consideration laws of similar import to the one here under consideration, and the three leading cases from the Supreme Court of the United States, West Coast Hotel Company v. Parrish, 300 U. S. 379, 57 S. Ct. 578, 81 L. Ed.

703, 108 A. L. R. 1330; Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469; Adkins v. Children's Hospital of District of Columbia, 261 U. S. 525, 43 S. Ct. 394, 67 L. Ed. 785, 24 A. L. R. 1238, have been carefully considered. The decisions in three of these courts, Florida, Alabama, and Iowa, were decided prior to the decision of the United States Supreme Court, in the West Coast Hotel Company Case, and while it is possible to point out distinguishing elements in those cases, and the law here under consideration, it is our conclusion that the courts would have maintained the same opinion had they had under consideration a statute similar to the Oklahoma statute, but we are just as certain that the opinions of those courts would not have held the law unconstitutional, if they had not been confronted with the decision in the Adkins Case, supra, and the decision in the West Coast Hotel Company Case had been rendered prior thereto. The opinions are all with closely divided members of the court. The decision in the Florida case, while concurred in by Justice Brown, his opinion upholds the principles of the constitutionality of the law, and concurs only with reference to its local application. The decision in the California case was rendered after the decision of the Supreme Court of the United States in the West Coast Hotel Company Case. The court attempts to justify its decision upon the ground that the cases heretofore cited, not only relied upon the decision of the Adkins Case, but upon other cases therein cited. And as stated before, we are of the opinion that notwithstanding the fact that a clear distinction might be made of the California and Oklahoma statutes, in that in the ordinance of the city of Bakersfield there was no finding that the law was enacted "to support and maintain reasonably safe and healthful barbering services to the public," yet we are of the opinion that the court would have followed the reasoning in the Adkins Case, and held the law invalid. There is just a fundamental difference in the opinion of judges upon this

important and close question. Our judgment is in accord with the decisions of the Supreme Court of the United States in the West Coast Hotel Company Case and the Nebbia Case, and not with the majority opinion in the Adkins Case, and the decisions of the Supreme Court of California.

The decision in the Parker Case (La.) was rendered during the time the Supreme Court of Oklahoma was considering the Herrin Case. Louisiana and Oklahoma statutes are almost identical. The only material difference being that in Louisiana the territory covered applied to "judicial districts," and in Oklahoma applied to "any city or town of 1,000 population or more according to the last Federal Decennial Census." When the decision was first rendered the majority of the court held the law unconstitutional, but upon rehearing, and about the time of the decision by the Supreme Court of Oklahoma in the Herrin Case, the court, in an opinion of five to two, held the law constitutional. Five of the seven judges wrote opinions in this case. We note in the brief of attorneys for petitioner, on motion for rehearing in the Supreme Court of this state, a strong criticism of the majority opinion in the Louisiana case. We have carefully read this opinion and we see no cause for criticism. The opinion is logical and reasonable and sets forth the reason for the position of the court in a strong and logical manner, being in perfect accord with the rule in the West Coast Hotel Company Case and the Nebbia Case, and in accordance with a liberal construction of the Constitution of the state and the United States, and in accord with the times in which we live.

We have read the decision of the Supreme Court of this state in the Herrin Case many times. It is a clear, concise statement of the law, as applied to the facts in this case, and stated in a logical and forcible manner. There is only one statement or conclusion therein in which we are not in perfect accord. It is our opinion that un-

der the provisions of section 12 of the act in question, it is a condition precedent to the action of the Barber Board that 75 per cent. of the duly licensed, registered and practicing barbers in said city or town shall file a petition with the board requesting an investigation by the board as to the establishment of minimum prices in such city or town. After said investigation is made, and such minimum prices established, the board has the right, on its own initiative, to investigate and change the prices if they find it necessary in order to properly provide healthful services to the public, and to keep the shops sanitary. There is no difference in opinion as the same conclusion is reached in each instance.

A careful reading of the Nebbia Case, and the West Coast Hotel Company Case, by the Supreme Court of the United States, with the principles therein announced, will convince one that the act here involved is constitutional. The Nebbia Case involved a law of the state of New York, which provided a "minimum price" for which milk could be sold in the city of New York, and surrounding territory. The argument of petitioner is that this case does not apply to the case at bar for the reasons: (a) That the Legislature of New York appointed a commission to make an investigation of the conditions surrounding the sale of milk, prior to the enactment of the act in question; and, (b) that this committee found that the production and distribution of milk was a paramount industry of the state, which highly affected the health and prosperity of the people. That this state of facts did and does not exist in Oklahoma with reference to the act in question. The opinion speaks for itself in answer to these contentions, when it says [291 U. S. 502, 54 S. Ct. 510, 78 L. Ed. 940, 89 A. L. R. 1469]:

"Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But

neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest. As Chief Justice Marshall said, speaking specifically of inspection laws, such laws form 'a portion of that immense mass of legislation which embraces everything within the territory of a state, * * * all which can be most advantageously exercised by the states themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a state, * * * are component parts of this mass.'

"Justice Barbour said for this court: '* * * it is not only the right, but the bounden and solemn duty of a state, to advance the safety, happiness and prosperity of its people, and to provide for its general welfare, by any and every act of legislation, which it may deem to be conducive to these ends; where the power over the particular subject, or the manner of its exercise is not surrendered or restrained, in the manner just stated. That all those powers which relate to merely municipal legislation, or what may, perhaps, more properly be called internal police, are not thus surrendered or restrained; and that, consequently, in relation to these, the authority of a state is complete, unqualified, and exclusive.'

"And Chief Justice Taney said upon the same subject: 'But what are the police powers of a state? They are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions. And whether a state passes a quarantine law, or law to punish offenses, or to establish courts of justice, or requiring certain instruments to be recorded, or to regulate commerce within its own limits, in every case it exercises the same power; that is to say, the power of sovereignty, the power to govern men and things within the limits of its dominion. It is by virtue of this power that it legislates; and its authority to make regulations of commerce is as absolute as its power to pass health laws, except insofar as it has been restricted by the Constitution of the United States.'

"Thus has this court from the early days affirmed that the power to promote the general welfare is inherent in government. Touching the matters committed to it by the Constitution the United States possesses the power, as do the states in their sovereign capacity touching all subjects jurisdiction of which is not surrendered to the federal government, as shown by the quotations above given. These correlative rights, that of the citizen to exercise exclusive dominion over property and freely to contract about his affairs, and that of the state to regulate the use of property and the conduct of business, are always in collision. No exercise of the private right can be imagined which will not in some respect, however slight, affect the public; no exercise of the legislative prerogative to regulate the conduct of the citizen which will not to some extent abridge his liberty or affect his property. But subject only to constitutional restraint the private right must yield to the public need.

"The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts."

And further says:

"But we are told that because the law essays to control prices it denies due process. Notwithstanding the admitted power to correct existing economic ills by appropriate regulation of business, even though an indirect result may be a restriction of the freedom of contract or a modification of charges for services or the price of commodities, the appellant urges that direct fixation of prices is a type of regulation absolutely forbidden. His position is that the Fourteenth Amendment requires us

to hold the challenged statute void for this reason alone. The argument runs that the public control of rates or prices is per se unreasonable and unconstitutional, save as applied to businesses affected with a public interest; that a business so affected is one in which property is devoted to an enterprise of a sort which the public itself might appropriately undertake, or one whose owner relies on a public grant or franchise for the right to conduct the business, or in which he is bound to serve all who apply; in short, such as is commonly called a public utility; or a business in its nature a monopoly. The milk industry, it is said, possesses none of these characteristics, and, therefore, not being affected with a public interest, its charges may not be controlled by the state. Upon the soundness of this contention the appellant's case against the statute depends.

"We may as well say at once that the dairy industry is not, in the accepted sense of the phrase, a public utility. We think the appellant is also right in asserting that there is in this case no suggestion of any monopoly or monopolistic practice. It goes without saying that those engaged in the business are in no way dependent upon public grants or franchises for the privilege of conducting their activities. But if, as must be conceded, the industry is subject to regulation in the public interest, what constitutional principle bars the state from correcting existing maladjustments by legislation touching prices? We think there is no such principle. The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property. The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price, the state is incapable of directly controlling the price itself. This view was negatived many years ago. Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77."

And further says:

"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and

to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the Legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court functus officio. 'Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.' Northern Securities Co. v. United States, 193 U. S. 197, 337, 338, 24 S. Ct. 436, 457, 48 L. Ed. 679 [700, 701]. And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the Legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power.

"The lawmaking bodies have in the past endeavored to promote free competition by laws aimed at trusts and monopolies. The consequent interference with private property and freedom of contract has not availed with the courts to set these enactments aside as denying due process. Where the public interest was deemed to require the fixing of minimum prices, that expedient has been sustained. If the lawmaking body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation

adopted fixes prices reasonably deemed by the Legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The Constitution does not secure to any one liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

The dissenting opinion of Justice McReynolds, which is concurred in by three of the Justices, states the contention of the opposition. It will be considered by those who believe in a strict construction of the Constitution of the United States as a strong opinion, and it does state strongly the facts and views relied upon by those who dissented, and those who support it will be in agreement with that part of the dissenting opinion, which says:

"Doubtless the statute before us would be condemned by an earlier generation as a temerarious interference with the rights of property and contract * * * with the natural law of supply and demand," but in disagreement with what follows, when the court says "But we must not fail to consider that the police power is the least limitable of the powers of government and that it extends to all the great public needs * * *; that statutes aiming * * * to stimulate the production of a vital food product by fixing living standards of prices for the producer, are to be interpreted with that degree of liberality which is essential to the attainment of the end in view."

Some of the statements in the dissenting opinion indicate and clearly demonstrate the thought that is uppermost in the mind of those who believe that only a strict construction should be placed upon the terms of the Constitution. The dissenting opinion says, in quoting from the case of Ex parte Milligan, 4 Wall. 2, 18 L. Ed. 281:

"The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism."

Also:

"Adkins v. Children's Hospital of District of Columbia, 261 U. S. 525, 545, 43 S. Ct. 394, 396, 67 L. Ed. 785, 24 A. L. R. 1238: 'That the right to contract about one's affairs is a part of the liberty of the individual protected by this clause [Fifth Amendment] is settled by the decisions of this court and is no longer open to question.'"

It will be noted that this is the case which was directly overruled by Chief Justice Hughes in the West Coast Hotel Company Case.

The dissenting opinion, quoting from the case of Wolff Packing Co. v. Court of Industrial Relations, 262 U. S. 522, 43 S. Ct. 630, 67 L. Ed. 1103, 27 A. L. R. 1280, says:

"It has never been supposed since the adoption of the Constitution, that the butcher, or the baker, the tailor, the wood chopper, the mining operator, or the miner was clothed with such a public interest that the price of his product or his wages could be fixed by state regulation."

And further:

"Such a system infringes the liberty of contract and rights of property guaranteed by the due process of law clause of the Fourteenth Amendment. 'The established doctrine is that this liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some pupose within the competency of the state to effect.'"

And finally it is said: "An end although apparently desirable cannot justify inhibited means."

And further says:

"The ultimate welfare of the producer, like that of every other class, requires dominance of the Constitution. And zealously to uphold this in all its parts is the highest duty intrusted to the courts."

These excerpts from the dissenting opinion are high-sounding, but as applied to the facts in the Nebbia Case, they sound the death knell for relief to those who earn by the sweat of their brow, and to those who are entitled to protection and sell their milk at such a minimum price as will justify their living and earning a small profit as a result of their investment and labor, and that they may do this in such a manner as to comply with the laws of their country in the maintenance of healthful and sanitary conditions. Such a construction of the Constitution as by the majority opinion will not stop the wheels of progress and destroy the government, but will make its terms applicable and livable in the age in which we live and as was intended by its framers. In the 89 A. L. R. 1495, the editor, after the opinion in the Nebbia Case, says:

"The great importance of this decision (Nebbia v. New York [291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469]) is obvious. The court in this case gives a new meaning to the phrase 'affected with a public interest,' or rather concludes that this formula is without value in determining the power of a state to regulate a business. And this decision definitely removes the taboo against price-fixing, and establishes the principle that the private character of a business does not prevent the state from regulating prices therein. The limitation or test set up by the court is that the legislation must not be arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt. And, on these principles, the New York state regulations fixing the price of milk were held to be valid."

The West Coast Hotel Co. Case is illustrative of the position here taken. This was a case involving the minimum wage law of the state of Washington, as applied to "married women." The principles announced apply with

special force to the facts in the instant case. Chief Justice Hughes in writing the majority opinion, says [300 U. S. 379, 57 S. Ct. 581, 81 L. Ed. 703, 108 A. L. R. 1330]:

"The Supreme Court of Washington has upheld the minimum wage statute of that state. It has decided that the statute is a reasonable exercise of the police power of the state. In reaching that conclusion, the state court has invoked principles long established by this court in the application of the Fourteenth Amendment. The state court has refused to regard the decision in the Adkins Case as determinative and has pointed to our decisions both before and since that case as justifying its position. We are of the opinion that this ruling of the state court demands on our part a re-examination of the Adkins Case. The importance of the question, in which many states having similar laws are concerned, the close division by which the decision in the Adkins Case was reached, and the economic conditions which have supervened, and in the light of which the reasonableness of the exercise of the protective power of the state must be considered, make it not only appropriate, but we think imperative, that in deciding the present case the subject should receive fresh consideration."

The court further says:

"The principle which must control our decision is not in doubt. The constitutional provision invoked is the due process clause of the Fourteenth Amendment governing the states, as the due process clause invoked in the Adkins Case governed Congress. In each case the violation alleged by those attacking minimum wage regulation for women is deprivation of freedom of contract. What is this freedom? The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation the Constitution does not recognize an absolute and uncontrollable liberty. Liberty in each of its phases has its history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals, and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is

reasonable in relation to its subject and is adopted in the interests of the community is due process.

"This essential limitation of liberty in general governs freedom of contract in particular. More than 25 years ago we set forth the applicable principle in these words, after referring to the cases where the liberty guaranteed by the Fourteenth Amendment had been broadly described.

" 'But it was recognized in the cases cited, as in many others, that freedom of contract is a qualified, and not an absolute, right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.' Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. 549, 565, 31 S. Ct. 259, 262, 55 L. Ed. 328 [337]."

And the court further says:

"And we added that the fact 'that both parties are of full age, and competent to contract, does not necessarily deprive the state of the power to interfere, where the parties do not stand upon an equality, or where the public health demands that one party to the contract shall be protected against himself.' 'The state still retains an interest in his welfare, however reckless he may be. The whole is no greater than the sum of all the parts, and when the individual health, safety, and welfare are sacrificed or neglected, the state must suffer.' "

And the court further says:

"The minimum wage to be paid under the Washington statute is fixed after full consideration by representatives of employers, employees, and the public. It may be assumed that the minimum wage is fixed in consideration of the services that are performed in the particular occupations under normal conditions. Provision is made for special licenses at less wages in the case of women who are incapable of full service. The statement of Mr. Justice Holmes in the Adkins Case is pertinent: 'The statute does not compel anybody to pay anything. It simply forbids

employment at rates below those fixed as the minimum requirement of health and right living. It is safe to assume that women will not be employed at even the lowest wages allowed unless they earn them, or unless the employer's business can sustain the burden. In short the law in its character and operation is like hundreds of so-called police laws that have been upheld.' 261 U. S. 525, at page 570, 43 S. Ct. 394, 406, 67 L. Ed. 785, 24 A. L. R. 1238. And Chief Justice Taft forcibly pointed out the consideration which is basic in a statute of this character: 'Legislatures which adopt a requirement of maximum hours or minimum wages may be presumed to believe that when sweating employers are prevented from paying unduly low wages by positive law they will continue their business, abating that part of their profits, which were wrung from the necessities of their employees, and will concede the better terms required by the law, and that while in individual cases, hardship may result, the restriction will enure to the benefit of the general class of employees in whose interest the law is passed, and so to that of the community at large.' Id., 261 U. S. 525, at page 563, 43 S. Ct. 394, 403, 67 L. Ed. 785, 24 A. L. R. 1238.

"We think that the views thus expressed are sound and that the decision in the Adkins Case was a departure from the true application of the principles governing the regulation by the state of the relation of employer and employed. Those principles have been reenforced by our subsequent decisions. Thus in Radice v. New York, 264 U. S. 292, 44 S. Ct. 325, 68 L. Ed. 690, we sustained the New York statute which restricted the employment of women in restaurants at night. In O'Gorman & Young v. Hartford Fire Ins. Co., 282 U. S. 251, 51 S. Ct. 130, 75 L. Ed. 324, 72 A. L. R. 1163, which upheld an act regulating the commissions of insurance agents, we pointed to the presumption of the constitutionality of a statute dealing with a subject within the scope of the police power and to the absence of any factual foundation of record for deciding that the limits of power had been transcended. In Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, dealing with the New York statute providing for minimum prices for milk, the general subject of the regulation of the use of private property and of the making of private contracts received an exhaustive examination, and we again declared that if such laws 'have

a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied'; that 'with the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal'; that 'times without number we have said that the Legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power.' Id., 291 U. S. 502, at pages 537, 538, 54 S. Ct. 505, 516, 78 L. Ed. 940, 89 A.L.R. 1469."

And the court further says:

"With full recognition of the earnestness and vigor which characterize the prevailing opinion in the Adkins Case, we find it impossible to reconcile that ruling with these well-considered declarations. What can be closer to the public interest than the health of women and their protection from unscrupulous and overreaching employers? And if the protection of women is a legitimate end of the exercise of state power, how can it be said that the requirement of the payment of a minimum wage fairly fixed in order to meet the very necessities of existence is not an admissible means to that end? The Legislature of the state was clearly entitled to consider the situation of women in employment, the fact that they are in the class receiving the least pay, that their bargaining power is relatively weak, and that they are the ready victims of those who would take advantage of their necessitous circumstances. The Legislature was entitled to adopt measures to reduce the evils of the 'sweating system,' the exploiting of workers at wages so low as to be insufficient to meet the bare cost of living, thus making their very helplessness the occasion of a most injurious competition.

"The Legislature had the right to consider that its minimum wage requirements would be an important aid in carrying out its policy of protection. The adoption of similar requirements by many states evidences a deep-seated conviction both as to the presence of the evil and as to the means adapted to check it. Legislative response to that conviction cannot be regarded as arbitrary or

capricious and that is all we have to decide. Even if the wisdom of the policy be regarded as debatable and its effects uncertain, still the Legislature is entitled to its judgment."

The dissenting opinion in this case was written by Justice Sutherland, and the identical Justices dissented who dissented in the Nebbia Case. The grounds of the dissent are practically the same as in the Nebbia Case, and an adherence to the principles announced in the Adkins Case, which is by the majority opinion in this case specifically overruled. In the dissenting opinion, it is said:

"Coming, then, to a consideration of the Washington statute, it first is to be observed that it is in every substantial respect identical with the statute involved in the Adkins Case. Such vices as existed in the latter are present in the former. And if the Adkins Case was properly decided, as we who join in this opinion think it was, it necessarily follows that the Washington statute is invalid."

Excerpts from the dissenting opinion give the sentiment of those who dissent as in the Nebbia Case, it says:

"It is, simply and exclusively, a law fixing wages for adult women who are legally as capable of contracting for themselves as men, and cannot be sustained unless upon principles apart from those involved in cases already decided by the court."

Shall we permit Chief Justice Hughes to answer this argument in the majority opinion, when he says:

"There is an additional and compelling consideration which recent economic experience has brought into a strong light. The exploitation of a class of workers who are in an unequal position with respect to bargaining power and are thus relatively defenseless against the denial of a living wage is not only detrimental to their health and well being, but casts a direct burden for their support upon the community. What these workers lose in wages the taxpayers are called upon to pay. The bare cost of living must be met. We may take judicial notice of the unparalleled demands for relief which arose during the

recent period of depression and still continue to an alarming extent despite the degree of economic recovery which has been achieved. It is unnecessary to cite official statistics to establish what is of common knowledge through the length and breadth of the land. While in the instant case no factual brief has been presented, there is no reason to doubt that the state of Washington has encountered the same social problem that is present elsewhere. The community is not bound to provide what is in effect a subsidy for unconscionable employers. The community may direct its law-making power to correct the abuse which springs from their selfish disregard of the public interest. The argument that the legislation in question constitutes an arbitrary discrimination, because it does not extend to men, is unavailing. This court has frequently held that the legislative authority, acting within its proper field, is not bound to extend its regulation to all cases which it might possibly reach. The Legislature 'is free to recognize degrees of harm and it may confine its restrictions to those classes of cases where the need is deemed to be clearest.' If 'the law presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied.' There is no 'doctrinaire requirement' that the legislation should be couched in all embracing terms. Carroll v. Greenwich Ins. Co., 199 U. S. 401, 411, 26 S. Ct. 66, 50 L. Ed. 246 [250]; Patsone v. Pennsylvania, 232 U. S. 138, 144, 34 S. Ct. 281, 58 L. Ed. 539 [543]; Keokee Consol. Coke Co. v. Taylor, 234 U. S. 224, 227, 34 S. Ct. 856, 58 L. Ed. 1288 [1289]; Sproles v. Binford, 286 U. S. 374, 396, 52 S. Ct. 581, 588, 76 L. Ed. 1167 [1183]; Semler v. Oregon State Board of Dental Examiners, 294 U. S. 608, 610, 611, 55 S. Ct. 570, 571, 79 L. Ed. 1086 [1088, 1089]. This familiar principle has repeatedly been applied to legislation which singles out women, and particular classes of women, in the exercise of the state's protective power. Miller v. Wilson, supra, 236 U. S. 373, 384, 35 S. Ct. 342, 59 L. Ed. 628 [632], L.R.A. 1915F, 829; Bosley v. McLaughlin, supra, 236 U. S. 385, 394, 395, 35 S. Ct. 345, 59 L. Ed. 632 [636, 637]; Radice v. New York, supra, 264 U. S. 292, 295-298, 44 S. Ct. 325, 326, 327, 68 L. Ed. 690 [694, 695]. Their relative need in the presence of the evil, no less than the existence of the evil itself, is a matter for the legislative judgment."

The dissenting opinion further states:

"The ethical right of every worker, man or woman, to a living wage may be conceded. One of the declared and important purposes of trade organizations is to secure it. And with that principle and with every legitimate effort to realize it in fact, no one can quarrel; but the fallacy of the proposed method of attaining it is that it assumes that every employer is bound at all events to furnish it."

It will thus be seen that those who dissent seem to recognize the justice of the cause, but cannot satisfy themselves to so construe the Constitution liberally, that relief may be given, even though it be a "class of workers who are in an unequal position with respect to bargaining power, and are thus relatively defenseless against the denial of a living wage," and which is not only "detrimental to their health and well-being, but casts a direct burden for their support upon the community. What these workers lose in wages the taxpayers are called upon to pay. The bare cost of living must be made." We cannot believe that it was the intention of those who wrote the Constitution that any such strict construction should be placed upon the same. It was so written that the "general welfare" of all the people might be protected the same as the "employer."

It is further stated in the dissenting opinion:

"In principle, there can be no difference between the case of selling labor and the case of selling goods."

This abstract principle may be true but certainly the law recognizes the right to regulate it, and especially with reference to the right to regulate it in the interest of the health and welfare of the general public.

The dissenting opinion further says:

"A statute requiring an employer to pay in money, to pay at prescribed and regular intervals, to pay the value of the services rendered, even to pay with fair relation to

the extent of the benefit obtained from the service, would be understandable."

It seems to us that this was exactly what the statute in question attempted to do. Certainly that is true in the instant case. The Barber Board has the right to investigate and determine the value of the services needed, taking into consideration the "benefit" obtained from the service, and the fair amount necessary to the proper rendering of a service that those engaged in the barber industry may maintain a shop and conduct the same in a healthful and sanitary manner.

It is further said:

"Women today stand upon a legal and political equality with men. There is no longer any reason why they should be put in different classes in respect of their legal right to make contracts; nor should they be denied, in effect, the right to compete with men for work paying lower wages which men may be willing to accept. And it is an arbitrary exercise of the legislative power to do so. * * *

"A more complete discussion may be found in the Adkins and Tipaldo [Morehead v. New York ex rel. Tipaldo, 298 U. S. 587, 56 S. Ct. 918, 80 L. Ed. 1347, 103 A. L. R. 1445] Cases cited, supra."

This, together with the interpretation of "liberty or freedom" of contract, placed upon the due process clause and the police power are the fundamental differences between the majority opinion and the dissenting opinion. One clings to one principle, the other to a different principle. Eminent judges and courts adroitly attempt to point out distinguishing elements, and we recognize there are distinguishing elements, but the principles are fundamentally different. One believes in a strict construction. The other believes in a liberal construction. These principles have been involved for years. In reading the opinions and dissenting opinions in the two cases which have been reviewed and quoted from at length, we

are firmly of the opinion that those who are for a liberal construction of the terms of the Constitution, are right, and that by this construction the Constitution may be a living, breathing instrument, protecting the rights of all the citizens of this country. We are not among those who believe that the Constitution will be destroyed by a liberal construction. We believe that the same consideration should be given to the "general welfare" clause of the Constitution as to the "due process" and "equal protection" clause. It is not meant by this, as some argue, that there is an attempt by those who believe in a liberal construction of that great document to change its terms, or to nullify its provisions, but to construe it as applied to the times in which we live, and as the framers intended it should be so construed, with a reasonable, fair construction, knowing that there is a constant change in our struggle for existence, and that what served our people well a century and a half ago will not meet the demands of this age.

The word "corporation" does not appear in the Bill of Rights of the Constitution. The word "person" does appear. With the change of years, the business of the country was handled by the organization of "corporations," and the word "person" was construed by the Supreme Court to mean "corporation," and thus the business interests of the United States were given the protection of the terms of the Constitution, and those who now denominate themselves as "conservatives" hailed with delight this "interpretation" and "liberal construction" of the Constitution, but now when a construction is had on the "general welfare" clause, giving it a meaning and interpretation where the rights of the people may be protected in this day and age against the advancements and greed of gigantic corporations, there is a cry that the fundamental principles of the government are being taken away, and that the Constitution is being destroyed. It is not destroying the Constitution but

placing upon that great document, a liberal interpretation, as has been done by the great members of that court in the past to the end that it may be a living, breathing Constitution, serving all of the people, who are governed by its terms. It is an interpretation in the interest of the "general welfare."

What is wrong with the act here under consideration? It provides for the appointment of a Board of Barber Examiners, who, under the direction of the State Commissioner of Health, shall prescribe "sanitary requirements for barber shops, and barbers and apprentice barbers working therein." Under the Act of 1937, the Legislature of this state, provided in section 1 of said act, 59 Okla. St. Ann. § 91, as follows:

"It is hereby declared that unfair, unjust, destructive, demoralizing and uneconomic trading practices have been and are now being carried on in the operation of barber shops in the state of Oklahoma, and that unfair competition exists between the individual barbers of this state to the extent that prices have been reduced by such unfair competition to the point where it is impossible for an average barber, although working regularly, to support and maintain reasonably safe and healthful barbering services to the public."

Section 12, heretofore quoted, gives the Barber Board, after a petition is submitted by 75 per cent. of "the duly licensed, registered and practicing barbers of any city or town of one thousand (1,000) population or more according to the last Federal Decennial Census," the right, upon investigation of the facts, to establish a minimum price for barber work in said cities and towns, to the end that the shops may be maintained and conducted, as will best "protect the public health and safety."

By section 7 of said act, 59 Okla. St. Ann. § 97, the members of the board are given the right of inspection, and the further right to inspect, "books, papers, records or documents," for the purpose of ascertaining facts to the end of establishing such minimum prices.

Under the principles of law announced in the leading cases from which we have quoted, there can be no question of the right of the Legislature to regulate the barber industry in the public interest, as affecting the health and sanitary conditions of its citizens. Whether or not such a condition exists is a matter to be determined by the Legislature. This legislative determination may be reviewed by the courts, when properly presented, but this applies only to questions of fact, and not one challenging the legislative power. As stated by Chief Justice Hughes, in the West Coast Hotel Company Case: "Even if the wisdom of the policy be regarded as debatable and its effects uncertain, still the Legislature is entitled to its judgment."

Under the act the Barber Board, upon its own initiative, or upon the petition of the barbers of said city or town, have the right to reinvestigate and adjust or change the minimum price, if in their judgment it is to the best interest of all concerned."

These cases further establish that the act in question does not interfere with the liberty and freedom of contract of the citizens of this state, as interpreted under the terms of the Constitution of the state and of the United States. Liberty does not mean an unbridled freedom, to contract and do as one chooses, to that extent of depriving the Legislature of the right of providing restrictive safe-guards in the interest of health and sanitation and the public welfare.

Under the act in question, it is not absolutely necessary for any citizen to patronize a barber shop, but it is a right which he should have if he deems advisable, the same as the right to demand that the transportation company transport his goods. Yet no one would question the right of the Legislature to regulate the rate which he pays.

The cases also establish the fact that the terms of the act in question are in no way violative of the police

power of the state. They are not unreasonable and extravagant in their nature and purpose, and do not arbitrarily interfere with or destroy the personal or property rights of the citizen. The argument that if this act is upheld the Legislature will be called upon by others of a similar nature to have established minimum rates can not be sustained. The acts of the Legislature are presumed to be in the interest of the citizenship of the state. This is a matter for their consideration, and those questions will be decided when presented.

The record in the instant case reveals that petitioner is refusing to obey the orders of the Barber Board, which establishes a minimum price in the town of Edmond of 35 cents for hair cutting and 20 cents for shaving. He alleges in his petition that he is unable, if forced to charge the prices above indicated, to keep open his place of business and to conduct the same without a loss. The charges which he is making are 25 cents for hair cutting and 15 cents for shaving. What would be the attitude of petitioner, if tomorrow a shop was opened in close proximity to his own and those exercising the right of liberty and freedom of contract for which he contends, established a price of fifteen cents for hair cutting and ten cents for shaving? This would, no doubt, force petitioner out of business. He would not be able to conduct his business, and comply with the sanitary and health laws of the state. Can it be said that the Legislature of a state has the right to regulate the barber business in the interest of public health and sanitation, yet it has not the right to establish a minimum price, which will permit the conducting of the place of business in a manner that the owners thereof will be enabled to conduct the same in a healthful and sanitary manner? If they haven't this power, then there is no reason for them to have the power to regulate and conduct them at all in the interest of the public health and sanitation laws of the state.

We do not deem it necessary to cite the many decisions of the state, federal, and Supreme Courts, which uphold the principles above set forth. They are cited in the leading cases and notes to which reference is made, if an examination of them is desired. We are firmly of the opinion, that if the Legislature of this state has the right to regulate the barber industry of this state in the interest of public health and sanitation, and to establish standards of fitness to engage in the profession under the exercise of the police power, then it has the power, through the Barbers' Board, as organized under the law, as a fact finding board, to fix and determine the minimum prices which may be charged by those engaged in the barber business, in designated areas, so that the public may be served by barbers who are not only skilled, but free from contagious disease, and that while so conducting their business in compliance with the laws of this state, they may at the same time be afforded a fair return on their investment and their labor.

For the reasons above stated, the writ of petitioner is denied, and he is remanded to the custody of the sheriff of Oklahoma county.

DOYLE, P. J., and DAVENPORT, J., concur.